**Mr. and Mrs. Albert N. WRIGHT, Mother and Father, Respectively, of Douglas Wright, a Minor, Plaintiffs,**

v.

**STANDARD OIL COMPANY, Inc., a Kentucky Corporation, D. L. Collums, and Dennis E. Tutor, Defendants.**

No. EC 6933.

United States District Court,
N. D. Mississippi, E. D.

Dec. 2, 1970.

Charles C. Finch, Batesville, Miss., Harold A. Katz, Chicago, Ill., for plaintiffs.

Ralph Holland, Tupelo, Miss., Watkins & Eager, Jackson, Miss., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

In this Mississippi-based diversity action, Albert N. Wright and wife, Grace Wright, citizens of Indiana, sue three defendants, Standard Oil Company, Inc., a Kentucky Corporation, D. L. Collums, Standard Oil's local agent in Lee County, Mississippi, and Dennis E. Tutor, company truck driver, for doctors', hospital, nursing and other medical expenses, and also for loss of services during minority, arising from bodily injuries sustained by their minor child, Douglas Wright. After a three-day nonjury trial and submission of briefs, the matter is now ripe for decision, the court having carried with the case motions for summary judgment filed by each side.

The accident in question occurred in Lee County, Mississippi, on July 5, 1963, at about 9:45 a. m. when Tutor, acting in the course of his employment for the other defendants, was operating a gasoline truck north on U. S. Highway 45 at or near the south edge of the city limits of Tupelo. Traveling at a speed of not more than 32 m. p. h. in an area having a posted 45 m. p. h. speed limit, Tutor was in the east lane for northbound traffic, at a point opposite Herring's Grocery Store located west of the highway, when plaintiffs' five-year old child, Douglas Wright, crossed the highway on foot going easterly and was struck by the truck as he crossed the centerline of the highway and was about to enter upon the east lane. U. S. Highway 45 is a two-lane concrete surface highway 20 feet in width with a graveled shoulder of varying widths on each side. It was a clear, bright day and the gasoline truck was carrying a load of 6300 gallons. Tutor was familiar with the vicinity, having made almost daily business trips on this highway, and was aware that from Verona north to Tupelo there was almost continuous residential and commercial development fronting the highway.

On this occasion Tutor, whose position in the cab placed him 7 feet above ground level, first noticed several small children on the east side of the highway almost directly opposite Herring's Grocery Store; he momentarily took his foot off the gas but as these children moved back from the highway, he did not

blow his horn or apply brakes. Deeming that both lanes ahead of him were clear, he put his foot back on the gas and proceeded forward. Tutor did not observe the Wright child in motion at any time while he was west of the highway, or on the west graveled shoulder, or in the west traffic lane, nor until almost the moment of impact when the truck's left front fender, just below the headlight, struck the child, who was carrying a carton of milk under his arm. The child was knocked forward approximately 12 to 15 feet with milk spilled on the concrete to the point where the child's body lay in the northbound lane several feet east of the centerline. Spilled milk was also noted on the truck's left headlight. The child sustained grievous personal injuries, involving a severance of the spinal cord, intracranial injuries, broken right leg and extensive other injuries which rendered him totally disabled and have resulted in his protracted hospital, medical and nursing care since the date of the accident.

The evidence discloses that Douglas Wright had accompanied his parents on a trip from Gary, Indiana, and had arrived the night before at the home of relatives who resided on the east side of U. S. Highway 45 directly opposite Herring's Grocery Store. The following morning, when Douglas wanted milk for his breakfast, his mother gave him money and told him to get his father, who was then at the north end of his brother's front yard assisting in cleaning a truck, to take him across the highway to purchase milk at the grocery store. The boy, clad only in swimming trunks and barefooted, relayed this information to Albert N. Wright, who took Douglas in his arms and walked westerly across the highway to the store which fronted upon the highway about 60 feet west of the westerly edge of the concrete surface. Wright put his son on the ground near the store's entrance, and the child went at once into the store. Without waiting for his son, Wright then recrossed the highway, proceeding somewhat northeasterly to rejoin his brother in cleaning the truck. Wright did not see his son when he came out of the store and was oblivious not only to his son's actions but also to existing highway traffic conditions, despite the fact that he knew it was generally a heavily traveled highway. Approximately 10 minutes after he had left his son in front of the store, Wright's attention was attracted by noise caused by the truck which, having struck Douglas, was braking and stopping. Both Wright and his wife knew that it was dangerous for their young son to attempt to cross the highway unattended. Wright testified that he told Douglas not to recross the highway alone but either get Gary Wright, a kinsman who worked inside Herring's Grocery Store, to assist him or call him. However, Wright did not propose to wait for his son to buy the milk and come out of the store, and left almost immediately.

Plaintiffs contend that defendants' truck driver failed to keep a proper lookout as, in the exercise of ordinary care, he should have seen Douglas Wright in time to sound his horn and slow, swerve or stop his truck, and these negligent omissions were the proximate cause of the accident; that neither plaintiff was guilty of negligence which contributed to the accident, either to bar recovery or to reduce allowable damages under Mississippi's comparative negligence statute;[1] and, finally, under applicable law, the conduct of Albert Wright, if negligent,

1. Miss.Code Ann. § 1454:

"In all actions hereafter brought for personal injuries, or where such injuries have resulted in death, or for injury to property, the fact that the person injured, or the owner of the property, or person having control over the property may have been guilty of contributory negligence shall not bar a recovery, but damages shall be diminished by the jury in proportion to the amount of negligence attributable to the person injured, or the owner of the property, or the person having control over the property."

may not be imputed in any way to Grace Wright, the other parent, who also asserts a right of action, independent of her husband, to recover medical expenses she contracted for and nursing care she alone rendered. Defendants, in addition to denying negligence on the part of the truck driver, argue that Albert Wright, as father, solely possesses the cause of action, and he is barred from recovery because he assumed the risk of injury to his son by exposing him to known danger; or, in the alternative, the actions of plaintiffs, both singly and jointly, constituted negligence and were a contributing, proximate cause of the accident, thus reducing allowable damages in proportion to such contributory negligence; and the cause of action being vested solely in her husband, Grace Wright has no separate cause of action for any elements of damage, independent of the claims of Albert Wright. In addition to these basic questions, there is vigorous disagreement as to what items of recoverable damage have been established by the evidence.

## I.

The primary issue, which is a fact question, is whether defendants' truck driver was negligent in his failure to observe Douglas Wright's presence upon the highway in time to take action to avoid the accident. Defendants contend that Tutor was not negligent in this regard because the child ran directly from behind a Tupelo city bus parked on the west shoulder, into the roadway and against the side of the truck's left front fender, so as to afford the driver no fair opportunity either to see the danger or take any evasive action.

Resolving the conflicts arising from the evidence, the court finds that as Douglas Wright came from the store, he was carrying a carton of milk under his arm, and ran at a 45° angle northeasterly across the graveled driveway and other open area in front of Herring's store toward the L. E. Wright truck shop. No bus or other vehicle was parked on the west side of the highway obscuring the presence of the child as he continued to run onto the west graveled shoulder looking at his father who was east of the highway; and without halting the child continued his running across the 10-foot west traffic lane directly into the path of defendants' northbound truck.

A northbound motorist traveling not more than 75 feet behind defendants' truck saw Douglas Wright when he was approximately 20 feet west of the pavement, observing that, as the child ran, he was not looking for northbound traffic. From Herring's Grocery there was then an unobstructed view to the south for a distance of several hundred yards with no vehicles parked directly in the line of sight, nor other objects blocking clear view except a fairly large tree and a mail box (38″ in height) in front of the grocery store; the tree was *20 feet* and the mail box was *17 feet* from the *western edge* of the pavement. There is an evidentiary basis for concluding, as we do, that the child's presence was observable by one in the position of Tutor for at least 5 seconds. During that time interval, Douglas Wright ran a distance of not less than 27 feet in open view of the truck driver before reaching the center of the highway; and one-half of the distance so traveled was definitely within the highway right of way; and for that same interval the truck, moving at 32 m. p. h., traveled approximately 230 feet. Yet Tutor was wholly unaware that the child was running toward his lane, and he did not, prior to the impact, blow his horn, apply brakes, or slow his truck in any manner. Had he seen the danger, Tutor stated he could have stopped the truck at its rate of speed within a distance of 45 feet; and when brakes were actually applied the truck traveled 65 to 70 feet beyond the point of impact.

The physical facts clearly demonstrate that, contrary to defendants' contention, the child did not run into the side of the truck but was struck by the truck's front end, at a point beneath the left headlight. The overwhelming evidence compels the inference that Douglas ran into the high-

way ahead of the truck and traversed at least 13 feet of concrete surface before being struck.

The court further finds that a few minutes after the accident occurred and before the gasoline truck was moved, a southbound Tupelo city bus stopped on the west shoulder of the highway at a motel north of Herring's Grocery to pick up passengers, and a few minutes later left on its journey. This was the bus parked in front of the motel which was seen by certain witnesses following the accident.

 Because of the foregoing we must conclude that, even though Tutor was driving at a reasonable rate of speed and otherwise obeying the rules of the road, defendants may not escape liability since Douglas Wright, while crossing the highway, came within the range of the driver's vision in sufficient time for him, in the exercise of ordinary care, to have seen and avoided striking him, and this omission proximately contributed to the accident. Failure of a driver to keep a reasonable lookout constitutes negligence, and he must continue on the alert for pedestrians and others using the highway.[2] Moreover, a motorist is presumed to have seen what he should have seen.[3] Where a motorist, using ordinary prudence, should have known of the presence of a small child on or along the highway, he "is required to use proper care in giving the necessary signals, in bringing his car under control, and in anticipating the unusual and impulsive actions characteristic of persons of immature years. * * * [H]e must be ready to guard against an unexpected and sudden movement on the part of the child, calculated to endanger the child's safety."[4]

We regard as inapposite to the present facts the Mississippi cases cited by de-fendants which deny recovery where the child darts from a parked vehicle or other place obscuring his presence, so suddenly as to make it impossible for the motorist to avoid hitting the child.[5] Perhaps defendants' best factual authority is Jones v. Dees, 241 Miss. 540, 131 So.2d 436 (1961), where on conflicting evidence, the jury found for the motorist when a 9-year old boy, *first observed 5 to 7 feet from the right side of the pavement*, was struck 2 or 3 feet over on the right lane of the highway, after the driver had cut his vehicle to the left, making a 45° angle across the highway at the moment of impact. The jury found as a fact that the boy had stopped on the far side of two obscuring mailboxes 12 feet from the right edge of the pavement before suddenly darting out into the street. A different result is compelled here, however, when a 5-year old child runs unseen but clearly visible at least 27 feet before getting into the path of the motor vehicle, and whose driver fails to take any evasive action whatsoever.

More analogous to the lookout issue is the twice-tried case of Gray v. Felts, 241 Miss. 599, 131 So.2d 454 (1961), and Gray v. Turner, 245 Miss. 65, 145 So.2d 470 (1962). On both occasions, the Mississippi Supreme Court set aside, as contrary to the clear weight of the evidence, jury verdict in favor of a motorist who, at about dusk dark, struck a child who was crossing a city street which had an open, unobstructed width of 24–26 feet and when the child had gotten almost across. The defendant testified she was looking ahead but saw nothing until the moment before striking the child. While the physical facts regarding lookout in *Gray* are somewhat more condemning than here, the Court's following holding is especially applicable:

2. Belk v. Rosamond, 213 Miss. 633, 57 So. 2d 461 (1952).

3. Lee v. Reynolds, 190 Miss. 692, 1 So.2d 487 (1941); Robinson v. Colotta, 199 Miss. 800, 26 So.2d 66 (1946); Robert-son v. Welch, 242 Miss. 110, 134 So.2d 491 (1961).

4. McMinn v. Lilly, 215 Miss. 193, 60 So.2d 603 (1952).

5. Agregaard v. Duncan, 252 Miss. 454, 173 So.2d 416 (1965); Moseley v. Bailey, 193 So.2d 729 (Miss.1967). Cf. Tidwell v. Ray, N.D.Miss., 208 F.Supp. 952 (1962).

"It is incredible that defendant would not have seen [the child] running almost all the way across the street, if [defendant] had been keeping a lookout, had her car under control, and was exercising reasonable care." [6]

Finally, we are unpersuaded by the argument that the presence of other children near the east side of the highway at the time of Douglas' emergence upon the pavement distracted the truck driver and that he should be cleared of any finding of fault for not seeing plaintiffs' child. This plea has a hollow ring because Tutor admittedly gave only momentary concern to the children he observed, deeming it unnecessary to blow his horn or slow his truck, and he continued on his journey. The mere circumstance that other children were also on or near the highway is simply not sufficient to exonerate the truck driver in light of the weight of the evidence which clearly points to a careless lookout.

## II.

While an infant of 5 years is incapable of being negligent, the law imposes a duty upon the parent having his care and custody to exercise ordinary care for the child's safety, and where a parent's failure to do so contributes proximately with the negligence of third persons to cause injury to the child, the parent is guilty of contributory negligence.[7] In Mississippi, prior to the adoption of its comparative negligence statute (Fn. 1), a parent's negligence in exposing or permitting a child to be exposed to danger was a bar to an action brought by the parent for the parent's own benefit, as distinguished from a suit by the injured child for his benefit; [8] but that statute removed the disqualification to recovery and merely reduces the amount of allowable damages.[9] A parent's action for loss of services of an injured child and expenses of cure, variously described in the decisions as "in the nature of a suit for personal injuries" or for "property damage", necessarily falls within the terms of Miss.Code § 1454 governing "actions brought for personal injuries or for injury to property." [10]

However, before further considering the influence of the comparative negligence statute upon the present case, it is necessary to examine briefly certain contentions, advanced for varying reasons by both the plaintiffs and defendants, that the statute is not here applicable.

First, plaintiffs contend that Albert Wright, the child's father, was not guilty of any negligence which proximately contributed to the accident. We summarily reject this argument because the undisputed facts show that Wright, who was cognizant of the danger to his son's crossing the highway unattended, failed to exercise ordinary care under the circumstances. In going to the store the child was on merely a brief errand, yet Wright failed to remain with him, issuing vague instructions to the child on how he should recross the highway. Wright did not take any step to assure that his son might return in safety. On the contrary, Wright himself returned to the east side of the highway without maintaining any surveillance whatever for his son, and stayed in a position where he could be easily seen by the child upon his exit from the store and who would be attracted by the sight of his father and would naturally want to go to him. Wright was absolutely heedless to the rational thought that his young son might become endangered by acting impulsively or showing immature judgment expected of a 5-year old child. Under these circumstances, Wright's conduct

6. Gray v. Turner, supra, at 472.

7. 67 C.J.S. Parent and Child § 46, p. 749.

8. Westbrook v. Mobile & Ohio RR Co., 66 Miss. 560, 6 So. 321 (1889).

9. Cumberland Tel. & Tel. Co. v. Cosnahan, 105 Miss. 615, 62 So. 824 (1913). Cf. Tombigbee Mill & Lumber Co. v. Hollingsworth, 162 F.2d 763 (5 Cir. 1947).

10. 67 C.J.S. Parent and Child § 41c, p. 743.

was not only negligent but it continued to be actively so until the very moment of the accident. In no fair manner may his actions be viewed as merely furnishing an occasion or creating a condition in which the truck driver's negligence became the sole, efficient and intervening proximate cause of the collision, but they were a major contribution to the tragedy.

To supersede Wright's original negligence, the conduct of the intervenor (Tutor) would have to be "so extraordinary and dangerous to himself or to others" that Wright "could not 'have realized that a third person might so act.' "[11] Plaintiffs realize no gain from that rule since the evidence plainly shows that an ordinarily prudent person in the shoes of Wright would have reasonably anticipated that some injury to his unattended child might occur under the circumstances. Nor may plaintiffs escape the consequences of contributory negligence by attempting to invoke the "last clear chance" doctrine upon a claim that the truck driver, despite Wright's negligent conduct, still had ample time to avoid the accident. Under Mississippi law, the last clear chance doctrine is quite limited and applies only after the peril is *actually discovered and actually appreciated* —a condition which did not here arise.[12]

▇▇▇▇▇▇ Second, defendants contend that their affirmative defense of the assumption of risk constitutes an absolute bar, which renders it unnecessary to consider the comparative negligence of the parties. Assumption of risk as a complete defense is a viable doctrine in Mississippi in cases other than master and servant relationships,[13] and ordinarily its application is for the trier of fact.[14]

In Saxton v. Rose, a distinction was drawn between assumption of risk and contributory negligence as follows: Assumption of risk arises when a party voluntarily and knowingly places himself in such a position, appreciating that injury to himself is liable to occur at any and all times so long as he remains in that position, while contributory negligence arises when, but not until, the injured person by his own conduct does or fails to do something which contributes to the particular event, and at the particular time and place, which was the immediate cause of the injury. In Elias v. New Laurel Radio Station, the Mississippi Supreme Court approved a statement of the elements which must be shown to constitute an assumption of risk in these words:

"(1) Knowledge on the part of the injured party of a condition inconsistent with his safety; (2) appreciation by the injured party of the danger in the condition; and (3) a deliberate and voluntary choice on the part of the injured party to expose his person to that danger in such a manner as to register assent on the continuance of the dangerous condition."

Even more recently the state Supreme Court [15] has tersely said that assumption of risk is governed by the subjective standard of the plaintiff himself, whereas contributory negligence is measured by the objective standard of the reasonable man. Using that test, we conclude that assumption of risk has not been proved here as an absolute defense for two reasons: (1) the evidence does not show that Wright had a conscious purpose or intention that his son should recross the highway unattended and be exposed to

---

11. Superior Oil Co. v. Richmond, 172 Miss. 407, 159 So. 850 (1935). See Sturdivant v. Crosby Lumber & Mfg. Co., 218 Miss. 91, 65 So.2d 291 (1953).

12. Illinois Central R Co. v. Underwood, 235 F.2d 868 (5 Cir. 1956), cert. denied 352 U.S. 1001, 77 S.Ct. 557, 1 L.Ed.2d 546.

13. McDonald v. Wilmut Gas & Oil Co., 180 Miss. 350, 176 So. 395 (1937); Sax-

ton v. Rose, 201 Miss. 814, 29 So.2d 646 (1947).

14. Elias v. New Laurel Radio Station, 245 Miss. 170, 146 So.2d 558 (1962). Assumption of risk is "a jury question in all but the clearest cases", Prosser, Law of Torts, 454 (3rd Ed.1964), a statement approved in Daves v. Reed, 222 So.2d 411 (Miss.1969).

15. Daves v. Reed, supra.

known danger in so doing, (2) nor does it show that Wright had actual knowledge of negligent vehicular operation by third parties which would increase the danger to his child beyond that posed by ordinary traffic hazards.

 Reverting to the comparative negligence statute, which we hold to be here applicable, our task becomes that of a trier of fact: viz, to compare the negligence of the truck driver with the negligence of Wright, since we have determined the negligence of both concurred in proximately contributing to the accident. By the statute's command, we are directed to assess "the amount of negligence" attributable to Wright, compare it with the "amount of negligence" attributable to Tutor, and reduce damages proportionately. Since there is no fixed rule for making such ascertainment, we, as a fact finder, must proceed upon practical judgment that finds support from the credible evidence. Our duty is "to consider all the facts and circumstances in evidence, meanwhile weighing preponderances, drawing inferences, balancing hypotheses, and comparing delinquencies in the light of * * * experiences as reasonable and honorable men." [16] Employing that standard, we have no hesitancy in holding that the negligence of Wright, weighed both quantitatively and qualitatively, is appreciably greater than the negligence of the truck driver. This difference may be appropriately measured by regarding Tutor's negligence as "simple negligence" and Wright's negligence as practically bordering upon "gross negligence". It is necessary, under § 1454, that we convert this difference between amounts of negligence to a percentage or factor attributable to each negligent actor. After mature consideration, we believe that a fair determination requires us to assess Wright with twice the degree of negligence that we assess against Tutor, which will cause the whole damages sustained by Wright to be reduced by two-thirds, thus limiting the recovery against defendants to one-third of that sum.

### III.

Before considering damages, it is necessary that we examine Mrs. Wright's contention that her claims in this parent's suit are independent of those of Albert Wright and her recovery, therefore, should not be diminished on account of his contributory negligence. Prior to and at all times since the accident, Albert Wright and Grace Wright have resided at East Gary, Indiana, with Douglas and other children of their marriage. Albert Wright, who was 52 years of age when the accident occurred, has been gainfully employed as a steel mill worker, while Mrs. Wright, then 46 years old, was employed as a janitress in a public school. Their income from these services was pooled for the family's support. After Douglas was injured, Mrs. Wright quit her job and has devoted practically her entire time to looking after Douglas who, because of his injuries, has required special care. While the evidence does not show Mrs. Wright has or has had any separate estate, she has agreed, jointly with her husband, to pay some of Douglas' medical expenses.

 It is clear that on the day of the accident Mrs. Wright was not personally negligent by merely consenting for Douglas to cross the highway with his father or by entrusting her son's safety to her husband, since she could not reasonably foresee that Albert Wright would be careless in parental duty. Nor does the record disclose any facts which justify invoking legal principles of agency to impose upon Mrs. Wright vicarious responsibility for her husband's acts. Defendants argue that since Mrs. Wright would be chargeable with the negligent acts of a third person to whom she might entrust temporary custody of a 5-year-old child,[17] she is no less responsible for

---

16. Circuit Judge Waller, speaking for the Fifth Circuit, in Tombigbee Mill & Lumber Co. v. Hollingsworth, supra.

17. 39 Am.Jur., Parent and Child, § 84, p. 730:

"Although there are a few decisions to the contrary, it is established by the

her husband's omissions. While we agree that the rule stated in Fn. 17 is good law, we do not consider it applies to create an agency relationship between spouses in matters directly affecting the care and welfare of their young children. The husband is not to be regarded as the wife's agent in the discharge of parental obligation to provide for the reasonable safety of his own child. The modern view strongly disfavors the concept of a joint enterprise, or principal and agent relationship, arising between spouses (or among other family members) while carrying out usual and ordinary activity incident to the family relationship.[18] We may surely not imply a common enterprise or other agency relationship results, so as to make the husband the wife's agent, where the only shared activity is to gratify their child's desire for milk for his breakfast.

Furthermore, we recognize that under Mississippi law, which we accept as here controlling on all substantive questions since that jurisdiction is the forum state, the situs of the accident, and has contacts with the parties more significant than has Indiana (whose law defendants argue should control as plaintiffs' domiciliary state), the negligence of the husband is not to be imputed to his wife merely because of the marital relation.[19]

Wholly apart from the question of imputing negligence to Mrs. Wright, the determinative issue on her claim is whether Albert Wright is the sole owner of the parent's right of action for the consequential damages for loss of Douglas' services during minority and expenses of his cure. Upon undisputed evidence, we conclude as a matter of law that he is so entitled and Mrs. Wright has no independent cause of action against the defendants. It has been generally held throughout the nation that the father, rather than the mother, is the parent entitled to sue a tortfeasor for consequential damages for injury to his unemancipated child, especially where both parents and the child live together and the father furnishes or contributes to their support, and ordinarily the cause of action devolves upon the mother only upon the father's death, desertion of the family or other cause.[20] This accords with the general rules that the father has the primary duty of supporting his minor child and the exclusive right, in the absence of statute, to its services and earnings, while the mother's duty and right are regarded as secondary to the father's.[21] It has been aptly stated that when a minor child is injured, two causes of action immediately spring into existence: first, the right of action by the child itself for the personal injury inflicted upon it; and second, a right of action to the parent for loss of services and expenses caused by the injury.[22] In the parent's action the basis for recovering loss of services is the duty of the child to render to its parent such services or earnings as may be reasonably expect-

decided weight of authority that if the parents of a child intrust it to the temporary custody of another, and the negligence of the custodian contributes to an accident resulting in injury to the child, such negligence is, on principles of agency, imputed to the parents and has the same effect on their right to recover as if they themselves had been guilty of the negligent act."

18. Harper & James, The Law of Torts, Vol. II, § 26.13, p. 1414 et seq. Prosser on Torts, 3rd Ed. § 71, p. 490. See also Restatement of the Law, Torts 2d, §§ 487 and 491.

19. McCorkle v. United Gas Pipeline Co., 253 Miss. 169, 175 So.2d 480 (1965);

Marr v. Nichols, 208 So.2d 770 (Miss. 1968); Woodard v. St. Louis, San Francisco R Co., 418 F.2d 1305 (5 Cir. 1969).

20. 67 C.J.S. Parent & Child § 41, pp. 742, 743; 39 Am.Jur. Parent & Child, § 87, p. 733. Many states have enacted statutes regulating the parent's right of action, some of which are merely declaratory of the general common law while others modify it in varying degrees. Mississippi has no statute which expressly deals with this type of action.

21. 39 Am.Jur., Parent & Child, § 38, p. 640.

22. 39 Am.Jur., Parent & Child, § 74, p. 718.

ed, and the basis for recovering expenses for cure arises out of the parent's legal obligation of support.[23]

Although no state decision appears to be exactly in point, Mississippi has often recognized and applied the underlying principles which have caused most jurisdictions to hold that ordinarily the parent's suit belongs to the father. The state Supreme Court has held not only that the father is entitled to the services and earnings of his minor child,[24] but also that he is *primarily* liable for the child's support,[25] even though the child may be in the custody of the mother. The mother is only *secondarily* liable for the support of the minor child.[26] These settled rules of law compel the conclusion that in Mississippi the parent's right of action is vested in the father except under special circumstances not presently applicable. To reinforce our view, it was recently held that medical and hospital expenses of an injured minor child are the debts of the father and that *he* has the right to bring a separate suit for them.[27] This same decision is direct authority for the proposition

that the father, as owner of the claim for expenses of cure, *waives* his separate right of recovery by bringing a suit on behalf of the child which places in issue such medical expenses. Similarly, the father waives the right to compensation for a child's earning capacity during minority by bringing suit and obtaining judgment as the child's next friend.[28]

We reject plaintiffs' contention that in Mississippi the mother, by statute, has been granted a right of action against the tortfeasor equal to the father's. While Miss.Code Ann. § 399,[29] which was first enacted in 1922, makes the mother and father joint guardians of their minor children and equalizes their parental rights and powers, the state Supreme Court has never interpreted it to relieve the father of his primary right and duty,[30] nor has it ever qualified the father's right to sue upon, or waive, the parent's separate cause of action.[31]

We also hold distinguishable the cases cited by plaintiffs which arise under the state's wrongful death statute[32]

23. Ibid, § 74, pp. 718, 719.

24. Marlar v. Smith, 134 Miss. 76, 98 So. 338 (1924).

25. Boyett v. Boyett, 152 Miss. 201, 119 So. 299 (1928); Pass v. Pass, 238 Miss. 449, 118 So.2d 769 (1960); Rasch v. Rasch, 250 Miss. 885, 168 So.2d 738 (1964); McInnis v. McInnis, 227 So.2d 116 (Miss.1969).

26. Boyett v. Boyett, supra.

27. Lane v. Webb, 220 So.2d 281 (Miss. 1969).

28. Brookhaven Lbr. & Mfg. Co. v. Adams, 132 Miss. 689, 97 So. 484 (1923). In *Adams*, the Court said (p. 485): "Assuming for the sake of the argument that ordinarily the right to compensation for the appellee's reduced earning capacity during his minority would be in his parents, that right was here necessarily waived, for his father, *in whom the right primarily rests*, brought this suit and obtained the judgment himself as the appellee's next friend." (Emphasis added.)

29. Miss.Code Ann. § 399, reads in part:

"The father and mother are the joint natural guardians of their minor children and are equally charged with their care, nurture, welfare and education, and the care and management of their estates. The father and mother shall have equal powers and rights, and neither parent has any right paramount to the right of the other concerning the custody of the minor or the control of the services or the earnings of such minor, or any other matter affecting the minor."

30. Rasch v. Rasch, supra, 168 So.2d at 744: "We repeat again, however, what has been said by this Court in many cases, that the father is primarily charged with the duty to support his minor child."

31. Mississippi follows the general rule that the mother of an illegitimate child is vested with right of action against the tortfeasor. Illinois Central R Co. v. Sanders, 104 Miss. 257, 61 So. 309, 44 L.R.A.,N.S., 1137 (1913).

32. Miss.Code Ann. § 1453. That statute provides in relevant part:

and seek damages for the death of an unmarried child (minor or adult), where the mother is made a statutory beneficiary, of equal rank with the father. Thus, in a death action the mother, no less than the father, is entitled to recover for loss of the services and earnings of their deceased minor child.[33] Death actions are wholly controlled by the state's Lord Campbell's Act, and they have no application whatever to the parent's separate action for consequential damages to the child.

While the reasonable value of nursing services which Mrs. Wright performed for Douglas is, without doubt, a proper element of damage, such services, where rendered to the injured child without actual compensation are a constituent part of the parent's right of action held by Albert Wright, and they may not be considered as the basis for a divisible action which can be separately maintained by Mrs. Wright and not subject to the legal effect of her husband's contributory negligence. Mississippi recognizes the general common law rule, which remains unaltered by any statute, that the services of the wife performed either while assisting the husband in his business,[34] or in the discharge of duties in the household,[35] belong to the husband, and he is entitled to recover for their reasonable value. The state Supreme Court has quoted with approval

that the husband's consortium "includes the performance by a wife of her household and domestic duties, in the sense of whatever is necessary in such respect according to their station in life, without compensation therefor. * * * It has been said that by entering into the marriage she impliedly agrees to perform such services without compensation. * * * " [36] It is upon the basis of the foregoing principle that courts have generally allowed the parent's action by the father to embrace a recovery for the gratuitous nursing services performed for the injured child by the mother.[37] We must, therefore, reject the contentions made on behalf of Mrs. Wright that the claim for nursing services which she gratuitously rendered at home to Douglas is either a right of action or an element of damage which should not be reduced in any amount by the comparative negligence standard.

IV.

Finally, we determine that the evidence establishes with reasonable certainty the parent's total damages to be $187,104.92. Since this sum must be reduced by two-thirds on account of Albert Wright's contributory negligence, plaintiffs' recovery in this action is adjudged to be $62,368.31. Our computation of the elements of damage and re-

---

"In such [death] action the party or parties suing shall recover such damages as the jury may determine to be just, taking into consideration all the damages of every kind to the decedent and all damages of every kind to any and all parties interested in the suit. * * * [I]f the deceased has no husband, nor wife, nor children, *the damages shall be distributed equally* to the father, mother, brothers and sisters, or such of them as the deceased may have living at his or her death." (Emphasis added.)

33. Gulf Refining Co. v. Miller, 153 Miss. 741, 121 So. 482 (1929) ; Gordon v. Lee, 208 Miss. 21, 43 So.2d 665 (1949). Cf.

Standard Dredging Corp. v. Henderson, 150 F.2d 78 (5 Cir. 1945), construing death benefit section of Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 909(d).

34. Cox v. Cox, 183 So.2d 921 (Miss.1966).

35. Gulf Transport Co. v. Allen, 209 Miss. 206, 46 So.2d 436 (1950).

36. Cox v. Cox, 183 So.2d 921, quoting 26 Am.Jur., Husband and Wife, § 9, p. 637.

37. See Ann. 90 A.L.R.2d 1337. A leading case on the subject is Johnson v. Rhuda, 156 Me. 370, 164 A.2d 675, 90 A.L.R.2d 1314 (1960), which discusses similar holdings from various jurisdictions.

covery is shown in the margin.[38] Our findings require further comment since the computation includes certain items objected to by defendants and is considerably less than the sum ($451,094.50) [39] demanded by plaintiffs.

Immediately following the accident on July 5, 1963, Douglas Wright, taken to a hospital at Memphis, Tennessee, was found to have a spinal fracture, with resulting paraplegia. On July 16, thoracic laminectomy was performed, revealing a completely transected cord. Several weeks later he was transferred to Methodist Hospital at Gary, Indiana, where additional surgery was done and he remained until October. The spinal injuries left Douglas without feeling in his body from his waist down and without control of bowel and urinary functions. An indwelling catheter and bag were first used for control of urine but after resulting complications a series of surgical operations took place over the next several years which ultimately bypassed the bladder and provided for urine discharge through a stoma, an opening made at the navel. This enabled Douglas to wear a special urine collecting device. Upon his discharge in October from Methodist Hospital, Douglas next entered the Rehabilitation Institute of Chicago

---

**38.** Accrued expenses of cure (7–5–63 to date of trial):

| | | | |
|---|---|---|---|
| (a) | Charges for hospitals, doctors, professional nursing, drugs and orthopedic appliances | 27,344.92 | |
| (b) | Extra cost of child's maintenance due to injuries, including additional clothing, bed clothing and other personal essentials | 3,000.00 | |
| (c) | Transportation expenses reasonably and necessarily incurred by parents to get Douglas to hospitals, doctors, school and other places, including hotel and plane tickets | 4,000.00 | |
| (d) | Special care and nursing provided to Douglas in the home (2038 days, exclusive of all days in hospital) at $20 per day | 40,760.00 | |
| | Total accrued expenses | | 75,104.92 |

Future expenses of cure (calculated for 8½ years until Douglas attains his majority):

| | | | |
|---|---|---|---|
| (a) | Hospital, doctors, professional nursing and drugs necessary and reasonable to be incurred for continuing care of child's urological and orthopedic problems, including necessary cost of spinal fusion surgery | 16,000.00 | |
| (b) | Repairing and replacing wheelchairs, braces and other orthopedic appliances | 5,500.00 | |
| (c) | Extra cost of child's maintenance | 7,500.00 | |
| (d) | Necessary travel to hospitals, doctors, school and other places | 2,000.00 | |
| (e) | Special care and attention in the home (exclusive of 6 months' professional nursing during convalescence from spinal fusion surgery) at $25 per day | 75,000.00 | |
| | Total future expenses of cure | | 106,000.00 |
| Loss of child's services to parent during minority | | | 6,000.00 |
| | Parent's total damages | | 187,104.92 |
| | Less two-thirds for comparative negligence | | 124,736.61 |
| | Net Recovery Allowed | | $62,368.31 |

---

**39.** All but $74,193.50 of plaintiffs' demand is for nursing services, $123,313 as accrued expense and $253,588 as future costs.

where he remained, except for brief intervals, until July 10, 1964. At the Institute he underwent a full rehabilitation program, being equipped with a specially-built wheelchair, long-leg braces with a pelvic band and other special appliances. During these months various skilled procedures were used to exercise the body, regulate bowel movement, provide for skin care, and teach activities of daily living. Responding well to these procedures, Douglas was gradually able to regain a measure of ambulation, with supporting crutches, as he progressed to walking with a swing-to gait. Eventually he was allowed to return home, at first only on weekends and then permanently, for him to enter public school in September 1964. On 9 different occasions during the ensuing years, Douglas was readmitted as a patient at Rehabilitation Institute; and he spent a total of 452 days in hospitals and had 13 different operations. His early rehabilitation was impeded by a fracture of the right thigh bone, which was followed by other orthopedic problems, all of which necessitated special orthopedic care at Wesley Memorial Hospital. At first, these complications considerably retarded Douglas' ambulation.

During the summer of 1964, however, Douglas regained an ability, with the aid of braces and crutches, to stand for short periods of time, climb small stairs and become, to a degree, independent in daily living. In the months which ensued Douglas, with the Institute's expert instruction, gradually increased his independence, learned to put on and remove his braces, partially dress and undress himself, transfer about, and himself do most daily activities, except for toilet and getting in and out of the bathtub. Mrs. Wright ceased intervening to empty the urine bag (which was used before the stoma operation) while Douglas was at school, at home or elsewhere. Although he spent much time in a wheelchair, Douglas' outlook was excellent and there were no great emotional problems occasioned by his disabilities. By November 1966 he had learned to walk very well, doing a swing-through gait. Although the excretory functions during the day became fairly manageable, at night he wore a diaper and had no bladder program. Because of complications which developed from a spastic, urogenic bladder, additional hospitalization for removal of bladder stones and urological surgeries at Children's Memorial and Presbyterian-Luke's Hospitals, in Chicago, became necessary during stated time intervals in the 1967–70 period. In July 1968 the stoma surgery heretofore mentioned was performed, and two revisions have since been made.

At time of trial Douglas was 12 years old and in the sixth grade. Considering the gross nature of his disabilities, he has made an excellent overall adjustment. He regularly takes piano lessons, bowls, attends church and participates in outdoor activities. Each day for a period of two hours in the morning he needs assistance in bathing, with his toilet and massage; only limited assistance is needed in dressing. Weather permitting, he is then rolled in his wheelchair to school several blocks away; otherwise, he goes by car, which requires lifting him in and out of the automobile. Upon arrival at school Douglas attends to himself until the lunch period, when he usually goes home, or if not, until the end of the school day. After school he takes physical therapy three times a week, which requires additional transportation. At bedtime he is bathed, again massaged, and during the night he must be turned at regular time intervals.

The evidence reveals with reasonable certainty that a scoliosis, or an abnormal curving of the spine, has developed, becoming progressively worse, and this condition will very likely cause Douglas to undergo surgery for a spine fusion to restore stability. This operation will require hospitalization for two months, then followed by home convalescence for an additional six months, which would

necessitate professional nursing care.[40] It also appears with reasonable certainty that certain future expenses will be incurred at periodic intervals for medical care of the stoma and accompanying urological problems.

The evidence also discloses that prosthetics needed for a "high-level paraplegic", such as long-leg braces, special shoes, knee locks, hip locks with attached back brace, will have to be regularly re-leathered, reconditioned and replaced to allow for Douglas' growth. Similarly from time to time his wheelchair will have to be reworked, reconditioned and replaced.

In our loss computation we have allowed all items of accrued cure expenses which are supported by bills or by reasonable estimate. In some respects we have reduced plaintiffs' estimates relating to additional costs of maintenance and travel expenses, where they appear somewhat excessive. Principally, we have rejected as exorbitant plaintiffs' demand that the damages should include standard charges for a licensed practical nurse 24 hours a day for home care for Douglas up to the date of trial. Licensed practical nurses were not at any time engaged by the family. The nursing service was actually performed by Mrs. Wright who quit her $350 monthly job to care for Douglas after obtaining instruction from the Rehabilitation Institute. Unquestionably, this home care provided by the mother exceeded the services ordinarily required of the parents or other family members; such care had, in our judgment, a reasonable worth of $20 per day, exclusive of the time spent by Douglas in hospitals. We conclude this is fair compensation when all circumstances are considered. During the past several years such nursing has been less demanding than in the early stages of the child's rehabilitation. As a practical matter, Mrs. Wright, who has acted commendably, has largely performed these ministrations in the home, and was able to schedule them so as to carry on her other household duties. Although Dr. Betts, the Medical Director of the Rehabilitation Institute, expressed an opinion that Douglas needed the services of practical nurses 24 hours a day, yet that conclusion is contradicted by his medical records which emphasized the desirability for Douglas to be on his own as much as possible and not impeded by over-protective assistance. Furthermore, the whole circumstances of the case clearly rebut that a necessity existed for licensed practical nurses. In our view, a reasonable worth has been assigned to the mother's care rendered in the home without pay.

Next, with respect to the parent's future expenses reasonably and likely to be incurred until Douglas attains 21 years of age, we hold that the undisputed medical opinions, as well as the subsequent facts as to spinal surgery, justify the recognition of substantial additional charges for continuing care of Douglas' urological and orthopedic problems. There will be further reasonable costs for Douglas' maintenance and for necessary orthopedic appliances. The vicissitudes will also require the incurring of additional transportation costs. These items, which must rest upon projected estimate of plaintiffs, have been revised and reduced only where necessary. We reject, however, as exorbitant plaintiffs' demand that the parent will reasonably incur licensed practical nursing expenses for the next 8½ years at a cost of $27.25 per 8-hour shift for 24 hours of each day. There is no credible evidence supporting such a claim or proof Douglas will necessarily have to have services of that character provided for him at home, except during the time that he may be convalescing from spinal surgery, the cost of which, including professional nursing care, has already been calculated in the future medical expenses. On the whole evidence, the court concludes that

---

40. The court has reopened the proof to allow the submission of a stipulation that Douglas Wright on November 17, 1970, underwent a spine fusion operation at the University of Minnesota Hospital, and is now in the recuperative phase of such surgery.

the services for home care which Douglas will need in the future will not be substantially different in degree or extent from what he was receiving at the time of trial. Since he is grossly incapacitated, he will, of course, always need, to a certain extent, the assistance of an attendant. While his independence in daily activities will, no doubt, increase as he grows older, greater muscular effort may be entailed in the assistance that will be needed. Such help need not be at the level of a practical nurse but may be well supplied by any able-bodied person. Considering all the relevant circumstances presented by the credible evidence, we conclude that the reasonable worth of his future assistance would be $25 per day, for which the sum of $75,-000 has been included as damages.

Finally, we have allowed $6,000 as reasonable value for the parent's loss of the child's services during minority. Notwithstanding the impossibility of showing outside earnings, this figure appears reasonable in view of the assistance that the parent might well expect Douglas to render in the home during the last ten years of his minority.

In line with our computation, we direct the entry of judgment for plaintiffs for $62,368.31.