Mr. and Mrs. Albert N. WRIGHT, Mother and Father, respectively, of Douglas Wright, a minor, Plaintiffs-Appellants,

v.

STANDARD OIL COMPANY, INC., a Kentucky Corporation, et al., Defendants-Appellees.

No. 71–1534.

United States Court of Appeals, Fifth Circuit.

Dec. 12, 1972.

Rehearing and Rehearing En Banc Denied Feb. 6, 1973.

Charles C. "Cliff" Finch, Batesville, Miss., Harold A. Katz, Chicago, Ill., for plaintiffs-appellants.

Ralph Holland, Tupelo, Miss., Watkins & Eager, Elizabeth W. Grayson, William E. Suddath, Jr., Jackson, Miss., for defendants-appellees.

Before JOHN R. BROWN, Chief Judge, and INGRAHAM and RONEY, Circuit Judges.

INGRAHAM, Circuit Judge:

## I.

On July 5, 1963, five year old Douglas Wright was visiting relatives near Tupelo, Mississippi, with his parents, Albert and Grace Wright. At approximately 9:35 A.M. Albert Wright took Douglas across U.S. Highway 45, which runs in front of the relative's home, to a small grocery store to buy some milk for the child's breakfast. Mr. Wright left Douglas at the store and recrossed the highway to help his brother polish a truck. A few minutes later Douglas attempted to recross the highway alone and was struck by a Standard Oil Company gasoline truck driven by Dennis Tutor. As a result of the accident the child's spinal cord was completely transected, and he was left a paraplegic.[1] Douglas has no feeling from his waist down, cannot use his legs, and has no control over his bladder and bowel functions. Extensive medical treatment has been required to maintain the boy's life functions, as well as, to bring him to a level at which he can participate in some normal activities. He has had thirteen different operations, has participated in a comprehensive rehabilitation program administered at a specialized institution and at home, and recently had a spinal fusion to correct an abnormal curving of the spine.[2] Douglas has made good progress however, and as he has grown older has been able to assume more responsibility for his own maintenance. He still requires daily nursing care, and since the accident his mother has been primarily responsible for the nursing services required by her son.[3]

This diversity suit was brought by Mr. and Mrs. Wright, citizens of Indiana, against Standard Oil Company, a Kentucky corporation, D. L. Collums, Standard's local agent for Tupelo, Mississippi, and Dennis Tutor, a Mississippi

---

[1]. The spinal cord was transected at the ninth thoracic level which is a high level severance according to the expert medical testimony. The following testimony is instructive:

"Q What significance is it, if any, for the severing or cutting of the spinal cord within the T–9 level instead of the lower level, if anything, what significance does that have?

"A Well, the lower the level is the more likely you are to have, say, some function in the lower extremities; if low enough, you could still have, say, muscles that would flex the hips, that is, bring the hips forward; if it were low enough, you could have bladder function, so that these are—the lower it is, the more muscles you are going to have and the more function and the better trunk stability as well."

[2]. The district court's opinion contains a concise, lucid summary of the child's medical history. Wright v. Standard Oil Company, 319 F.Supp. 1364, 1377–78 (N.D.Miss., 1970).

[3]. We will discuss the nature of her nursing services in more detail later in the opinion.

citizen and the driver of Standard's truck. The Wrights sought damages for the loss of their son's services and for past and future medical expenses arising from the accident. After a trial to the court, Tutor was found negligent because he failed to keep a proper lookout and could have avoided hitting the child if he had exercised ordinary care; his negligence was a proximate cause of the accident. Grace Wright was not found negligent, but her husband Albert Wright was contributorily negligent in giving his son an opportunity to cross the dangerous highway alone. The father's negligence was also a proximate cause of the accident. The Wrights were found to have suffered damages of $187,104.92. Included in this amount was $115,760 for the value of Mrs. Wright's past and future nursing services.[4]

4. The following itemization of medical expenses was prepared by the district court. 319 F.Supp. 1377, n. 38:

*"Accrued expenses of cure* (7–5–63 to date of trial) :

| | | |
|---|---:|---:|
| (a) Charges for hospitals, doctors, professional nursing, drugs and orthopedic appliances | 27,344.92 | |
| (b) Extra cost of child's maintenance due to injuries, including additional clothing, bed clothing and other personal essentials | 3,000.00 | |
| (c) Transportation expenses reasonably and necessarily incurred by parents to get Douglas to hospitals, doctors, school and other places, including hotel and plane tickets | 4,000.00 | |
| (d) Special care and nursing provided to Douglas in the home (2038 days, exclusive of all days in hospital) at $20 per day | 40,760.00 | |
| Total accrued expenses | | 75,104.92 |

*Future expenses of cure* (calculated for 8½ years until Douglas attains his majority) :

| | | |
|---|---:|---:|
| (a) Hospital, doctors, professional nursing and drugs necessary and reasonable to be incurred for continuing care of child's urological and orthopedic problems, including necessary cost of spinal fusion surgery | 16,000.00 | |
| (b) Repairing and replacing wheelchairs, braces and other orthopedic appliances | 5,500.00 | |
| (c) Extra cost of child's maintenance | 7,500.00 | |
| (d) Necessary travel to hospitals, doctors, school and other places | 2,000.00 | |
| (e) Special care and attention in the home (exclusive of 6 months' professional nursing during convalescence from spinal fusion surgery) at $25 per day | 75,000.00 | |
| Total future expenses of cure | | 106,000.00 |
| *Loss of child's services to parent during minority* | | 6,000.00 |
| Parent's total damages | | 187,104.92 |
| Less two-thirds for comparative negligence | | 124,736.61 |
| Net Recovery Allowed | | $62,368.31 |

When the Mississippi Comparative Negligence Statute [5] was applied, the court concluded that Mr. Wright's negligence had contributed two-thirds to the accident, while Tutor's negligence had contributed the other one-third. The damages were consequently reduced by two-thirds leaving a final award of $62,368.31 on which judgment was entered. Mr. and Mrs. Wright appeal from this judgment.

The trial court held that "Albert Wright is the sole owner of the parent's right of action for the consequential damages for the loss of Douglas' services during minority and expenses of his cure." Wright v. Standard Oil Co., 319 F.Supp. 1364, 1374 (N.D.Miss., 1970). On this basis all damages were reduced by the father's two-thirds comparative negligence. The appellants contend that the trial court erred in this holding and in reducing all damages. The issue is whether a wife, in the parents' action arising from an injury to their minor child, has a legally protected interest independent of her husband. This is a question of first impression in Mississippi, and we are *Erie* bound to decide it as would a Mississippi court. Erie R. R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Other issues concern the lower court's ruling on the application of the last clear chance doctrine, the decision that Mr. Wright was negligent, and the decision that Mr. Wright's negligence contributed two-thirds to the cause of the accident.

## II.

Before we decide whether Mrs. Wright has an interest independent of her husband, we consider briefly the choice-of-law problem raised by this issue. Because the Wrights are domiciliaries of Indiana and have their marital domicile there, appellees advance the theory that whether Mrs. Wright has an interest apart from her husband in the parents' action should be determined by Indiana law rather than Mississippi law; they characterize the problem as one of status involving the husband-wife relationship, or perhaps they feel that the policies underlying Indiana law could be significantly advanced through its application to this issue. We agree with the trial court that a Mississippi court would apply Mississippi law to all the issues raised in this case.

A federal court sitting in a diversity case must apply the choice-of-law rules of the forum state. *See* Erie R. R. Co. v. Tompkins, supra; Klaxon Co. v. Stentor Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Alabama Great S. R. v. Allied Chemical Corp., 467 F.2d 679 (5th Cir., 1972). The Mississippi Supreme Court has abandoned the strict place of the injury rule as the standard for choosing the applicable law in a muti-state tort case. Mitchell v. Craft, 211 So.2d 509 (Miss., 1968). The court adopted an approach based on § 145 of the Restatement (2nd) of Conflict of Laws and on the views of Professor Robert Leflar.[6] 211 So.2d at 514–517.

---

5. Miss.Code Ann. § 1454 (1956). This statute provides:

"In all actions hereafter brought for personal injuries or where such injuries have resulted in death, or for injury to property, the fact that the person injured, or the owner of the property, or person having control over the property may have been guilty of contributory negligence shall not bar a recovery, but damages shall be diminished by the jury in proportion to the amount of negligence attributable to the person injured, or the owner of the property, or the person having control over the property."

6. The court relied on the following law review articles: Leflar, Choice-Influencing Considerations in Conflicts Law, 41 N.Y. U.L.Rev. 267 (1966); Leflar, Conflicts Law: More on Choice-Influencing Considerations, 54 Calif.L.Rev. 1584 (1966). *See* 29 A.L.R.3rd 603, at 631 (1970).

Section 145 provides the general principles to be followed in tort cases:
(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

We have considered appellees' argument that Indiana law should be applied in the context approved by Mitchell v. Craft, *supra*. We have no doubt that a Mississippi court would decide that Mississippi has the most significant relationship to the parties and the occurrence and would, therefore, apply its own law to decide this issue. Mississippi is the place where the injuries occurred, the place where the conduct causing the injuries occurred, and either the domicile or the place of business of the appellees.

Although Indiana is the Wrights' marital domicile and has a statute regulating who may sue for injuries to a child,[7] we do not believe a Mississippi court would apply this statute.

In Mitchell v. Craft the Mississippi Supreme Court stated that "an important consideration is the application of the better rule of law." 211 So.2d at 514. A Mississippi court would recognize that the Indiana statute may contravene the equal protection clause of the Fourteenth Amendment under the rationale of Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), and in view of the possible constitutional difficulties, we feel a Mississippi court would opt for its own law. Especially is this true in the instant case where Indiana's only contact with the parties or the occurrence is that it is the appellants' domicile. In other situations this single contact might achieve greater significance; for example, if the Indiana statute was designed to promote harmony or prevent discord in the marital relationship, or to prevent collusive suits between spouses, then perhaps there would be an Indiana policy which would be advanced by applying its statute. However, applying this statute to our facts to determine whether Mrs. Wright has an interest in the parents' claim would not seem to advance the policy underlying the statute which is not to protect the marital relationship. *See* Mayhew v. Burns, 103 Ind. 328, 2 N.E. 793 (Ind.1885); Thompson v. Town of Ft. Branch, 178 N.E. 440 (Ind.1831). While this statute may advance Indiana policies when Indiana is the forum, those policies would not be furthered by applying the statute in a Mississippi forum. For this reason, Mississippi would look solely to forum law. This brief analysis illustrates several grounds upon

---

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
 (a) the place where the injury occurred,
 (b) the place where the conduct causing the injury occurred,
 (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
 (d) the place where the relationship, if any, between the parties is centered.
These contacts are to be evaluated according to their relative importance with respect to the particular issue."

Section 6, on the other hand, sets forth the general principles to be followed when dealing with any choice-of-law problem, including such factors as: (1) the effect of a choice-of-law on the interstate system; (2) the relevant policies of the forum; (3) the policies and interests of other interested states in the determination of the issue involved; (4) the policies underlying the particular field of law involved; and (5) the ease in the determination and application of the applicable law and the certainty, predictability and uniformity achieved by choosing a certain law.

7. Ind.Code Ann. § 2–217 (1967), IC 1971, 34–1–1–8, provides:
"Action for injury or death of child.— A father, or in case of his death, or desertion of his family, or imprisonment, the mother, or in case of divorce the person to whom custody of the child was awarded, may maintain an action for the injury or death of a child; and a guardian may maintain such action for the injury or death of his ward; in case of death of the person to whom custody of the child was awarded, a guardian shall be appointed to maintain an action for the injury or death of his ward. But when the action is brought by the guardian for an injury to his ward, the damages shall inure to the benefit of his ward."

which to deny the application of Indiana law. When considered together, they confirm our conviction that a Mississippi court would apply forum law to determine whether Mrs. Wright has an interest in the parents' claim apart from her husband.

Having concluded that Mississippi law should be applied, we move now to the resolution of the substantive issues.

### III.

The district court reasoned that because a father has the primary obligation to support his minor child he is the sole owner of the parents' suit for consequential damages suffered as a result of the child's injury. In addition, the court treated Mrs. Wright's nursing services as a part of the husband's consortium, to which he is entitled because of the marital relation, and thus concluded that Mr. Wright was alone entitled to recover the reasonable value of Mrs. Wright's services. There is a two-step analysis present here. The father is the sole owner of the parents' right of action because he has the primary obligation of support; secondly, as the sole owner of the right, he is entitled to all the damages. Thus all damages must be reduced by his comparative negligence —a portion of the damages cannot be segregated and remain immune from the application of the comparative negligence standard. Our interpretation of Mississippi law, influenced by contemporary concepts concerning the rights of women, causes us to reject the conclusions reached by the court below and urged on us by the appellees.

In order to decide whether Mrs. Wright has an independent interest in the parents' right of action, we must identify the elements of damage which comprise it. First is the value of the lost services of the child until majority; second is the medical expense incurred to cure the child's injuries. Our case requires a further breakdown of the medical expenses into those arising from the nursing services provided by Mrs. Wright and all other expenses exclusive of the nursing services. Our discussion will proceed accordingly.

Mississippi statutorily established the equality of parents in dealing with their children in section 399 of the Mississippi Code. This statute is particularly relevant concerning the right to services and earnings of a minor. It provides:

> "The father and mother are the joint natural guardians of their minor children and are equally charged with their care, nurture, welfare and education, and the care and management of their estates. The father and mother shall have equal powers and rights, and neither parent has any right paramount to the right of the other concerning the custody of the minor or the control of the services or the earnings of such minor, or any other matter affecting the minor. . . ."

Miss. Code Ann. § 399 (1956). The district court felt that this statute was not dispositive because "the state Supreme Court has never interpreted it to relieve the father of his primary right and duty [evidently referring to the duty of support], nor has it ever qualified the father's right to sue upon, or waive, the parent's separate cause of action." Rasch v. Rasch, 250 Miss. 885, 168 So.2d 738 (1964), was cited as support for the court's decision to disregard the statute. Rasch deals with the continuing duty of a father to support his offspring even after divorce and award of custody to the mother. The case does not consider the problem of which parent is entitled to the earnings and services of a child, nor does it purport to interpret § 399.[8]

---

8. In Marlar v. Smith, 134 Miss. 76, 98 So. 338, 339 (1924) the court held that a father is entitled to the earnings and services of his minor child. We do not disagree with this general proposition, but it is not controlling in our case. The issue in that case was not whether the mother and father were equally entitled to their son's services and earnings but was whether an emancipated minor's earnings were beyond the reach of his father's creditors. This case simply does not support the assertion that the father has rights paramount to the mother.

We have found only one case which squarely considers this problem, Standard Dredging Corp. v. Henderson, 150 F.2d 78, 81 (5th Cir., 1945). This court, relying on § 399, recognized that a mother and father were equally entitled to their son's wages. The fact that the action was one for wrongful death does not derogate from the court's holding.

■ There are apparently no Mississippi decisions interpreting this statute on facts similar to ours. In these circumstances we are left with the facial commands of the statute and the persuasive authority of the *Henderson* case. The statute unequivocally says that parents have an equal right to the services and earnings of their child. We cannot conclude therefore that simply because a father is said to have the primary duty of support, he also has the paramount right to his child's earnings and services. As the district court noted: "In the parent's action the basis for recovering loss of services is the duty of the child to render to its parent such services or earnings as may reasonably be expected, . . . ." 319 F.Supp. at 1374. In Mississippi the parents have an equal expectation to the services and earnings of their child. In other words, a child's duty to his father does not predominate over the child's duty to his mother. To allow a child's father to recover the entire amount of damage attributable to the loss of a child's services would be contrary to the rationale

underlying the right of action in addition to violating the express provision of § 399.

■ We hold that the district court erred in reducing the damages attributable to the loss of the child's earnings by the father's comparative negligence. The mother should be allowed $3000, and the father's $3000 should be reduced by two-thirds.[9]

The second element of damages in a parents' suit arising from injuries to their minor child is for medical expenses caused by the injuries. Of the $181,104.92 of accrued and future medical expenses, $115,760 is derived from the value of actual and prospective nursing services rendered by Mrs. Wright to her son. Mrs. Wright argues that this amount should not have been reduced by her husband's comparative negligence. We agree.

The trial court's conclusion that the damages referable to Mrs. Wright's nursing services must be reduced by her husband's comparative negligence was reached in part by the analysis described above;[10] that is, because the father is primarily liable for the support of his children, he is the sole owner of the parents' action and thus all damages are his alone and must be reduced by his negligence. It does not follow, however, that because a father is said to be primarily liable for the support of his minor children he should be deemed the sole owner of the parents' cause of action.[11] The

---

9. Our decision does not turn on who is termed the owner of the parents' right of action, and we do not hold that this statute gives the mother a separate cause of action. Nevertheless, this statute, when considered with the Mississippi rule that one spouse's negligence is not imputed to the other, precludes reducing the mother's right to her child's earnings and services by the father's comparative negligence.

10. See the discussion beginning at § III, *supra.*

11. The district court relied on 67 C.J.S. Parent and Child, § 41 at 742 (1950), to support its conclusion that Mr. Wright was the sole owner of the action. An

examination of the cited authority reveals that it does not support the conclusion reached. Section 41(b) provides:

"Since the right to the services and earnings of a minor child ordinarily is in the father, . . . the right to sue for loss of services of the child as between the parents belongs primarily to the father . . . ."

We have already shown that in Mississippi the mother and father have an equal right to services and earnings of their minor child under § 399 of the Mississippi Code. Therefore, the premise on which the conclusion that the right to sue belongs primarily to the father is based becomes defective when Mississippi law is plugged into the equation.

initial flaw in this conclusion is exposed when the cases cited to support it are examined. For example, in Boyett v. Boyett, 152 Miss. 201, 119 So. 299 (1928), the court held only that a father must continue to support his child after he and the child's mother are separated. A divorced father must also provide for his child's college education to the extent of his financial ability if the child is "worthy of and qualified for" such an education. Pass v. Pass, 238 Miss. 499, 118 So.2d 769, 773 (1960). Rasch v. Rasch, 250 Miss. 885, 168 So.2d 738, 744 (1964), reaffirms the rule that a father's duty to support his children continues after a divorce or the awarding of custody to the mother. McInnis v. McInnis, 227 So.2d 116 (Miss., 1969), is to the same effect although the court there recognized that under § 2743 of the Mississippi Code a divorce court could compel a wife to contribute monetarily to the support of the children of the marriage. In each of these cases the courts label the father's duty as "primary," but that characterization was not necessary to the result reached in any of the cases. These cases arose in a divorce or separation setting. When considered in this context, they do little more than hold that a father who sires offspring in the marriage remains liable, in a monetary sense at least, for the support of his offspring notwithstanding his divorce or separation from their mother.[12] We cannot import a deeper meaning than this to these cases. They do not directly support the conclusion that a father should be termed the sole owner of the parents' cause of action; and they do not persuade us to reach this result by deduction.

Appellees also rely on the general language of Lane v. Webb, 220 So.2d 281, 285 (Miss., 1969), that:

"Medical and hospital expenses of a minor or obligations and debts of the father. Where the father has incurred or paid them, he has the right to bring a separate suit for them."

The issue in that case was not whether the child's mother could maintain an action, nor whether the mother could recover for her nursing services. The issue was rather whether a father suing as next friend of his minor child could recover, in favor of his child, damages attributable to the medical expenses incurred by the father as a result of the child's injuries. The court reversed an earlier decision, St. Regis Paper Co. v. Seals, 211 So.2d 547 (Miss., 1968), which held that these damages could only be recovered in a separate suit by the father, and held that the father's claim to these damages was waived in favor of his child and could be recovered in a single suit by the father as next friend. Lane is clearly distinguishable from the case at hand. When the language quoted above is considered with the remainder of the court's opinion in light of the issue raised, its significance to the issue facing us is minimal.

Moreover, when the attitude of Mississippi toward women is considered with the conclusion that our case does not fit within the mold of cases cited to uphold the obligation to support—sole owner of the cause of action rationale, we cannot deny Mrs. Wright a legally protected interest in the value of her nursing services.

■ Mississippi has removed the disabilities attached to women as a result of the marital relationship.[13] Section

12. *See* Wansley v. Schmidt, 186 So.2d 462, 465 (Miss., 1966), in which the Supreme Court of Mississippi said, "Praiseworthy though it may be that having incurred the duty of supporting a second wife, appellant also voluntarily assumed the support of her four children, nevertheless, a father's first and paramount duty is to provide support for his own children."

13. Miss.Const. art. 4, § 94, provides:
"The legislature shall never create by law any distinction between the rights of men and women to acquire, own, enjoy, and dispose of property of all kinds, or their power to contract in reference thereto. Married women are hereby

399 of the Mississippi Code has already been examined in connection with Mrs. Wright's interest in the damages arising from the loss of her son's earnings and services. We reached the conclusion that this statute is a Mississippi exception to the asserted general rule that a father has the paramount right to his child's earnings and services. The question whether Mrs. Wright has an interest, apart from her husband, in the value of her nursing services is not answered by § 399. This statute illustrates, however, that Mississippi does not regard women as second class citizens. It is indicative of a policy to treat women with equality and not to relegate them to a secondary status when they get married. Section 451 of the Mississippi Code is even stronger evidence of this policy. It provides:

"Married women are fully emancipated from all disability on account of coverture; and the common law as to the disabilities of married women and its effect on the rights of property of the wife, is totally abrogated, and marriage shall not impose any disability or incapacity on a woman as to the ownership, acquisition, or disposition of property of any sort, or as to her capacity to make contracts and do all acts in reference to property which she could lawfully do if she were not married; but every woman now married, or hereafter to be married, shall have the same capacity to acquire, hold, manage, control, use, enjoy, and dispose of all property, real and personal, in possession or expectancy, and to make any contract in reference to

it, and to bind herself personally, and to sue and be sued, with all the rights and liabilities incident thereto, as if she were not married."

With the exception of the clause giving a married woman a cause of action for loss of her husband's consortium, this statute has existed in its present form since 1906. It thus evidences a long standing policy that women should be treated equally. The recent addition of the clause allowing a married woman to sue for loss of consortium demonstrates that this is a viable policy. While it is doubtful that the legislature considered a situation like ours when it passed this statute, it nevertheless supports our allowing Mrs. Wright to recover the full value of her nursing services undiminished by her husband's comparative negligence.[14]

A recent decision of the Mississippi Supreme Court lends additional support to our conclusion that the district court's decision regarding Mrs. Wright's nursing services cannot be sustained. The issue in Cooke v. Adams, 183 So.2d 925 (Miss., 1966) was whether a married woman's estate was liable for medical services rendered to the decedent prior to her death. The lower court denied the claim on the authority of McLemore v. Riley's Hospital, Inc., 197 Miss. 317, 20 So.2d 67 (1944), which held that in the absence of an express agreement by the woman to pay for the services her husband was obligated to pay for them as necessities. Obviously, Cooke is factually distinguishable from our case. That, however, does not diminish the relevancy of the following

---

fully emancipated from all disability on account of coverture. But this shall not prevent the legislature from regulating contracts between husband and wife; nor shall the legislature be prevented from regulating the sale of homesteads."

14. In Austin v. Austin, 126 Miss. 61, 100 So. 591, 592 (1924), the Mississippi Supreme Court was interpreting Article 4, Section 94 of the Mississippi Constitu-

tion (supra, n. 13) and the predecessor of Section 451 when it said:

"Our Constitution and statutes on the subject [the emancipation of women] were enacted for the purpose of striking down the inequalities existing between husband and wife. The intent was to put the wife on the exact equality with her husband—to emancipate her from the common-law slavery to her husband."

statement by the *Cooke* court in its overruling of *McLemore*:

> "We have re-examined *McLemore*, supra, and have concluded that an unwarranted restriction was engrafted upon Mississippi Code Annotated section 451 (1956) dealing with the emancipation of married women. That section, first enacted in 1880, concludes with a provision that a married woman shall have the same capacity '* * * to bind herself personally, and to sue and be sued, with all the rights and liabilities incident thereto, as if she were not married.'
>
> . . . .
>
> "The public policy of this State with respect to this subject is founded upon Article 94 of the Mississippi Constitution, and is spelled out in section 451, supra. The necessity for reconsideration of the rule stated in *McLemore*, supra, is pointed up not only by the result of its application to the facts in this case, but also by *a clearly discernible nation-wide trend, of both state and federal legislation, to expand rather than to restrict the economic and personal emancipation of women* and their ever increasing participation in business and professional affairs."

183 So.2d at 926–27 (emphasis added). The court went on to hold that the decedent's estate was liable for medical expenses under an implied contract theory.

The significance of Cooke v. Adams to our case lies in the italicized portion of the preceding quote. This statement convinces us that even though § 451 may not be directly applicable to our facts, the result we have reached is in accord with the view of the Mississippi Supreme Court. Denying Mrs. Wright an interest in the parents' action is a restrictive view regarding the economic and personal emancipation of women, and we decline to adopt it.[15]

■■ Our decision that Mrs. Wright has a legally protected interest in the damages attributable to the loss of her son's services, as well as in the value of her nursing services, is consistent with the Mississippi rule which does not impute a husband's negligence to his wife merely because of the marriage. *See, e. g.*, Woodward v. St. Louis-San Francisco Ry., 418 F.2d 1305 (5th Cir., 1969); Marr v. Nichols, 208 So.2d 770 (Miss., 1968); McCorkle v. United Gas Pipeline Co., 253 Miss. 169, 175 So.2d 480 (1965); Illinois Cent. Ry. v. Brashier, 224 Miss. 588, 80 So.2d 739 (1955). It is incongruous to recognize that Mississippi does not impute negligence to Mrs. Wright and then to reduce the damages arising from her nursing services by two-thirds because of her husband's negligence. What the trial court purported to give with one hand was quickly taken away with the other. It is little solace for Mrs. Wright that she was not negligent, either by her actions or by imputation, when the same result is reached by another method.

Rules of law should be consistent and harmonious with each other. Consistency is achieved by our conclusion that Mr. Wright's comparative negligence should not reduce the damages awarded as a result of Mrs. Wright's nursing services because this decision corresponds with the non-imputation of negligence rule. If there were different social policies underlying the non-imputa-

---

15. The following statement by the *Cooke* court reflects the view that its decision did not alter the basic family relationship, nor affect the nature of the moral or legal obligations flowing from that relationship:

> "It is not intended that anything in this decision shall change, diminish, or affect any duty or obligation of husband or wife to each other, nor the obligation which rests upon the husband to support his wife and family, nor their right to look to him for such support." 183 So.2d at 927. We reiterate this statement for it is equally applicable to the result we have reached here.

The statement in *Cooke* is also significant because of the recognition that the "obligation to support" rule as it applies in the relationship between husband and wife (or a former husband and wife) should not govern situations involving the relationship of husband and wife vis-a-vis third parties.

tion of negligence rule and the rationale which supposedly justifes reducing all damages by the husband's comparative negligence, then perhaps consistency would not be a proper goal. However, we do not perceive conflicting policies. The non-imputation of negligence rule is a recognition that a woman does not lose her individuality when she marries—she is not deemed negligent just because she is married to a negligent man. And this rule does not undermine the family relationship. Likewise, while our decision is an express recognition that a woman does not sacrifice her individuality by marriage, it will not affect the family relationship.

■ We turn now to the appellees' argument that Mrs. Wright's services are an element of her husband's consortium. The trial court buttressed its conclusion that Mrs. Wright has no interest apart from her husband by reasoning:

"... [T]he husband's consortium 'includes the performance by a wife of her household and domestic duties, in the sense of whatever is necessary in such respect according to their station in life, without compensation therefor. * * * It has been said that by entering into the marriage she impliedly agrees to perform such services without compensation. * * *' It is upon the basis of the foregoing principle that courts have generally allowed the parent's action by the father to embrace a recovery for the gratuitous nursing services performed for the injured child by the mother."

319 F.Supp. at 1376, quoting Cox v. Cox, 183 So.2d 921 (Miss.1966).

A summary of Mrs. Wright's activities in caring for her son will put this argument in its proper perspective. After she awakens Douglas about 6:30 A.M., Mrs. Wright takes him to the bathroom (via wheel chair), places him on the commode, and begins preparing his bath.[16] If his bowels do not move,[17] Mrs. Wright must remove the feces manually through the rectal opening. When the bath water is ready, Mrs. Wright must place her son in the bath tub. This relatively simple procedure is complicated by the fact that Douglas's bones are brittle and break easily, so Mrs. Wright must make certain that she places him in the water very carefully. She then bathes him and returns him to his bed where she administers the first of two daily massages.[18] When Mrs. Wright

16. Special oils are added to the water in order to make it suitable for Douglas's delicate skin.

17. The reader will recall that Douglas has no bowel or bladder control and is unable to feel when his bowels move. This becomes especially troublesome when Douglas suffers from diarrhea which occurs about once every two weeks according to Mrs. Wright's testimony.

18. Doctor Betts testified, without contradiction, that it is "absolutely vital" that a paraplegic's skin received meticulous attention. He is the medical director of the Rehabilitation Institute of Chicago and was personally responsible for some of the care rendered to Douglas at the Institute. The following is an excerpt from the testimony of Dr. Betts:

"Q Doctor, could you tell us what significance, if any, is there to having Douglas' skin properly cared for if any, from a medical point of view as a paraplegic?

A Absolutely vital.

Q Absolutely vital?

A I mean, it sounds so simple, and yet you know the development of skin sores, pressure sores is just one of the most severe complications that can occur in these people, I mean, I have had patients who developed them, then they invade bones, they have lost their legs, lost their whole hip articulation, lost the whole lower extremity at the hip, so on with the progression of these sores. The prevention of the sores is absolutely vital to the patient being able to continue any reasonable kind of life.

Q Would you describe to His Honor the type of care that is necessary to see that a paraplegic like Doug is absolutely vital to have in order to survive, keep from having amputation of the other parts of his body?

A Have to watch the skin, sounds like a simple thing, but they have to look at it see whether they have sores; they have got to keep the skin clean and

massages her son, she must pay particular attention to the skin in the paralyzed area, using lotions to keep the skin in good tone. Douglas's skin must be kept clean and dry because moisture will macerate the skin. This is not a simple task because Douglas perspires profusely as a result of his impaired nervous system.

In preparing her son for the day, Mrs. Wright must also provide for the control of his urine. We quote from the district court's opinion:

"An indwelling catheter and bag were first used for control of urine but after resulting complications a series of surgical operations took place over the next several years which ultimately bypassed the bladder and provided for urine discharge through a stoma, an opening made at the navel. This enabled Douglas to wear a special urine collecting device."

319 F.Supp. at 1377.

Mrs. Wright massages the stoma opening daily by putting her finger in the opening to dilate it so that the opening does not become too small to be functional. After this is done, she "cements" the urine bag around the stoma opening. Again, this is not an easy procedure; the cement does not readily adhere to the scar tissue around the stoma, and the area is difficult to keep dry because of the continual leakage of urine. When the urine bag is in place, Douglas is dressed, put in his wheel chair, taken to the car, lifted from his wheel chair into the car, and driven two blocks to school. The time is about 8:20 A.M.

Mrs. Wright picks Douglas up and brings him home for lunch. After school she again picks him up (she testified that she goes to school an average of three times a day), and three times a week she takes Douglas for physical therapy treatments in East Gary, Indiana. After returning home from either school or therapy, Mrs. Wright goes through essentially the same procedures —undressing, bathing, massaging, and taking off and reattaching the urine bag to the stoma—that she goes through in the mornings. It is also necessary for her to administer physical therapy to Douglas's lower extremities; that is, she must put the paralyzed joints through a full range of motion. The record is unclear whether she does this every day, but since Dr. Betts testified that Douglas needs some therapy every day, it appears that she gives her son therapy at least on the days when he does not go to a professional therapist, which would be four times a week. Mrs. Wright's activities do not end when her son goes to bed. The delicate condition of her son's skin makes it necessary for her to turn Douglas to different sleeping positions at two hour intervals throughout the night. She is so accustomed to sleeping in two hour stretches that she no longer needs an alarm to wake up when it is time to change her son's position.

Our summary here is not as detailed as it might have been and does not include all of the things that Mrs. Wright has done over the years. We are aware that as Douglas grows older and more mature Mrs. Wright's duties may decrease somewhat. Nevertheless, the argument that her services belong to her husband falls of its own weight. Even a cursory examination of the services Mrs. Wright renders to her son compels the conclusion that her activities are far beyond those contemplated by the marital relationship. Her activities cannot be characterized as normal household and

---

dry and in good tone. If they develop the slightest little abrasion or the slightest little sore or slightest little bump or anything, they have to keep off it, they have to move their position frequently. Most people move, I mean, you know, those of us who are so-called normal will move much more than we realize. This is what prevents us

from developing sores. They must remember to move or be moved frequently to keep the pressure off.
Q In relation to nighttime, how often if you have an opinion should little Dougie be moved through the night, if any?
A Well, every few hours."

domestic duties which by entering into the marriage she impliedly agreed to perform without compensation.[19] We have no difficulty concluding that they exceed those which the law includes under the consortium label.[20]

On the basis of the preceding discussion, we hold that Mrs. Wright has a legally protected interest in the value of her nursing services rendered to her son.[21] The district court was therefore in error when it reduced the damages attributable to the non-negligent spouse by her husband's comparative negligence.[22]

We have disposed of Mrs. Wright's claims in a manner consistent with the available Mississippi law and find it unnecessary to squarely face the constitutional issue raised when the district court's holding is compared with Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed. 2d 225 (1971). *In Reed* the Supreme Court unanimously struck down, as violative of the equal protection clause of the fourteenth amendment, an Idaho statute which expressed a mandatory preference for a male over a female administrator without an examination of their individual qualifications. We must admit, however, that our interpretation of Mississippi law and our conclusions regarding the manner in which a Mississippi court would have solved the issues facing us were reached with an awareness that a different interpretation or a different result would raise significant constitutional questions.

As yet, we have not mentioned the $65,344.92 in damages arising from past and future expenses of cure exclusive of the mother's nursing services. The district court reduced these damages by Mr. Wright's comparative negligence. This result also cannot be supported by the obligation to support—sole owner of the cause of action rationale. However, that does not mean that the decision regarding this element of damages is erroneous because it can perhaps be justified on a different basis.

■■■■ It is clear that a Mississippi woman can enter a contract which does not bind her husband or which binds her

---

19. *See* text preceding n. 16, supra.

20. The appellees, as did the district court, rely on the cases in 90 A.L.R.2d 1337 as support for the argument that Mr. Wright's consortium includes his wife's gratuitous nursing services to their son, thus precluding her from recovering, in her own right, the value of her services. The thrust of this annotation is whether gratuitous nursing services are a recoverable element of damages. In our case, however, there is no dispute concerning the propriety of Mrs. Wright's services being a proper element of damages. The question is whether she can recover these damages from a third party tort feasor undiminished by her husband's comparative negligence. The annotation does not answer this question.

Moreover, this question is not answered by the general principle that a husband is entitled to his wife's services. This statement may well be too broad, but we do not question the basis on which it rests—the reciprocity of the marital relationship. *See* Cox v. Cox, 183 So.2d 921 (Miss.1966). Although this proposition may have an appropriate place when analyzing the relationship between husband and wife, it, like the primary obligation of support rule, should not be extended to govern situations involving the husband-wife vis-a-vis third parties.

21. The following cases furnish varying degress of support for our holding: Bush v. Bush, 95 N.J.Super. 368, 231 A.2d 245 (Law Div.1967) ; Armstrong v. Onufrock, 341 P.2d 105 (Nev., 1959) ; Winnick v. Kupperman, 29 A.D.2d 261, 287 N.Y.S.2d 329 (1968) ; Skollingsberg v. Brookover, 484 P.2d 1177 (Utah 1971).

22. Our holding does not preclude a husband from recovering the value of his wife's nursing services, provided that the wife is adequately represented in the suit, and we do not hold that the wife must bring a separate suit. The claim for expenses of cure of a minor child is termed "the parents' cause of action." It seems consistent to treat the claim as a joint one, and in Mississippi, which does not impute negligence between spouses, to consider damages which are peculiarly attributable to one spouse's activities as going to that spouse undiminished by the other's comparative negligen᠁᠁.

separate estate jointly with her husband. *See* Miss.Code Ann. § 451, 1942; Cooke v. Adams, 183 So.2d 925 (Miss., 1966); Montgomery Ward & Co. v. Nickens, 203 Miss. 195, 33 So.2d 815 (1948); Skehan v. Davidson Co., 164 Miss. 518, 145 So. 247 (1933). But our record is not clear whether Mrs. Wright agreed, either expressly or impliedly, to bind her separate estate for the various medical expenses involved here. Also, the record does not disclose whether the creditors who rendered goods or services to Douglas agreed to look solely to Mrs. Wright for payment.[23] On this record we are reluctant to decide the treatment of this element of damages since we have taken a completely different approach to the issue than did the trial court. We therefore remand for the district court to hear additional evidence relating to this particular element of damages and intimate no view on how the issue should be resolved.

### IV.

■ Appellants contend that the last clear chance doctrine removes from Mr. Wright the burden of his contributory negligence. The Mississippi courts have applied what the Restatement (Second) of Torts refers to as the "conscious last clear chance" rule. Before the doctrine is applicable under this formulation, a defendant must know of the plaintiff's situation and realize the peril involved in it.[24] It is not enough that defendant should have realized that plaintiff was in a perilous position. An analysis of Mississippi cases casts no doubt on the continuing validity of this court's statement in Illinois Central R.R. Co. v. Underwood, 235 F.2d 868, 877 (5th Cir., 1956), that: "There must be a 'clear' chance after the peril is actually discovered and actually appreciated" for a defendant, through the exercise of ordinary care, to avoid an accident. *See* New Orleans & Northeastern R.R. Co. v.

---

23. Appellants attach significance to Mrs. Wright's signing the admittance forms to various hospitals. This circumstance alone, however, is not enough to warrant the conclusion that the creditors agreed to look to Mrs. Wright for payment.

24. Restatement (Second) of Torts, § 479 at 530–531 (1965).

§ 479 reads as follows:

"A plaintiff who has negligently subjected himself to a risk of harm from the defendant's subsequent negligence may recover for harm caused thereby if, immediately preceding the harm,

(a) the plaintiff is unable to avoid it by the exercise of reasonable vigilance and care, and

(b) the defendant is negligent in failing to utilize with reasonable care and competence his then existing opportunity to avoid the harm, when he

(i) knows of the plaintiff's situation and realizes or has reason to realize the peril involved in it or

(ii) would discover the situation and thus have reason to realize the peril, if he were to exercise the vigilance which it is then his duty to the plaintiff to exercise."

The comment on subclause (i) of clause (b) helps to clarify the meaning of this section. It reads:

"*e.* The words 'or has reason to realize' denote that the defendant knows the plaintiff's situation, and that his situation is such that a reasonable man in the defendant's place would realize the plaintiff's peril. In order that this Subclause shall be applicable, the defendant must, therefore, know of the plaintiff's situation; it is not enough that he would have known of it had he been exercising that vigilance which it was his duty to the plaintiff to exercise. As to this see Subclause (ii), which states the rule which determines the plaintiff's right to recover when the defendant, although not knowing of the plaintiff's situation, should have discovered it."

Restatement (Second) of Torts, § 479, comment *e* at 532 (1965).

As appellants point out in their brief, the application of last clear chance in terms of "conscious last clear chance" or "discovered peril" creates the anomalous situation that a defendant fares better if he never even sees the plaintiff as was the situation here. We are not free, however, to adopt new rules for the Mississippi courts and must take Mississippi law as we find it.

Burney, 248 Miss. 290, 159 So.2d 85, 91 (1963); Mississippi Cent. R. Co. v. Aultman, 173 Miss. 622, 160 So. 737, 740 (1935); Gulf, M. & N. R. Co. v. Arrington, Miss., 107 So. 378 (1926). *See also* Gulf, Mobile & Ohio R.R. Co. v. Hollingshead, 236 So.2d 393 (Miss., 1970). In *Aultman*, for example, the Mississippi Supreme Court approved a last clear chance instruction that the train engineer must have seen, known, and appreciated the peril of the bus in time to have stopped the train before the collision.

We recognize that Fuller v. Illinois Cent. R. Co., 100 Miss. 705, 56 So. 783 (1911), contains language supporting the proposition that last clear chance applies even if defendant did not have actual knowledge of plaintiff's perilous position.[25] The dicta from this decision has not been followed in subsequent cases, and we cannot give it a meaning beyond that given by the Mississippi courts. We conclude then that the district court properly refused to apply the last clear chance doctrine to the facts of our case.

## V.

 Appellants next assert that the trial court erred in finding the fa-

ther, Albert Wright, contributorily negligent. Gordon v. Lee, 208 Miss. 21, 43 So.2d 665 (1949) is cited for the following principle:

> "[T]hat if a parent leaves a child of tender years unattended temporarily across a highway, even though the parent might know that the child would be likely to undertake to cross the highway in returning home, when the child leaves that place and enters an area of peril, and the child is thereupon injured through the negligence of another person, the parent is not deemed to be contributorily negligent where the accident to 'the child could have been avoided by the defendant through the exercise of reasonable care in keeping a constant lookout for pedestrians who may chance to use the highway.'"

This is a quote from appellant's brief and the quote within the quote is from Gordon v. Lee at 668.[26] This is a valiant effort to fit the facts of our case within those of Gordon v. Lee, but it is of no avail. In that case the jury found that a mother who thought her child was playing on a courtyard was not negligent in allowing the unattended child to "[climb] over [a] seawall and [enter] the highway either by going through a

---

25. The *Fuller* court discusses the origin of the last clear chance doctrine and says, "the contributory negligence of the party injured will not defeat the action if it is shown that the defendant might by the exercise of reasonable care and prudence have avoided the consequence of the injured party's negligence." *Id.* at 785. The opinion does not mention a need for defendant's discovering the peril before the last clear chance doctrine is applicable.

26. The entire quote from Gordon v. Lee, from which the excised portion was taken, is as follows:

 "But it is urged on behalf of the defendant that the mother of the child was guilty of negligence in permitting it to go out to the beach unattended, knowing that it would be likely to undertake to cross the highway in returning home. The mother explained her apparent negligence in this regard by

telling the jury that she thought the child was playing on the courtyard nearby. At any rate, any failure on her part to properly safeguard the safety of the child would not be attributed to the other plaintiffs, and we are unable to say that such failure would constitute the direct or proximate cause of its death, where the jury was warranted in finding that the killing of the *child could have been avoided by the defendant through exercise of reasonable care in keeping a constant lookout for pedestrians who may chance to use the highway.*"
*Id.* at 668 (emphasis added). It is evident from this quote that the court was not establishing a rule of law, but rather showing that the verdict of the jury was reconcilable with the facts of the case. Appellants attempt to graft the italicized portion of this quote to the facts of our case will not take.

vent ten inches high and forty-eight inches long" or in climbing over a concrete curb. The defendant in Gordon v. Lee was evidently arguing that the mother was contributorily negligent as a matter of law when she allowed her child to go to the beach unattended, knowing that the child might cross the highway in returning home. All the Mississippi Supreme Court said in that case was that the jury was warranted in finding that the mother was not negligent. The court did not hold that a parent could never be negligent in allowing a small child to cross a highway alone. Appellants would have us adopt a rule that a parent who knows that his child is likely to cross a busy highway may abandon his child, go about his business, and rely, both for the safety of his child and for his own safety under the law, on those using the highways to exercise care to avoid running over the child. This absurd result cannot be ascribed to the courts of Mississippi under Gordon v. Lee nor to us under Erie Railroad Co. v. Tompkins. We hold that the district court, as the fact-finder in our case, was justified in finding Albert Wright contributorily negligent.[27] Mr. Wright knew the highway was a busy one, that

Douglas should not cross it alone, and yet he failed to exercise that degree of care necessary to protect his young son. We realize that even the most careful parent cannot keep an ever-present eye on his child, and our holding does not require this of a parent.[28] A parent is, however, required to exercise reasonable care to protect a child from harm, and under our facts, Mr. Wright did not meet this standard.[29]

## VI.

Appellants' final contentions are that the district court erred in finding that Mr. Wright's negligence contributed two-thirds to the cause of the accident and in finding that the value of Mrs. Wright's nursing services was $115,760 rather than $376,911 as claimed by Mrs. Wright. We hold that the court, as the fact-finder in this case, did not err in either instance.

## VII.

We conclude that the district court's decision must be reversed in part for the entry of judgment consistent with this opinion and remanded for proceedings consistent herewith.

27. When the trial court sits without a jury, its findings of fact "shall not be set aside unless clearly erroneous". F.R.Civ.P. 52(a).

28. We are not faced with a situation where a parent has left a child in a seemingly safe place with the child subsequently wandering on to a busy highway. E. g., Gordon v. Lee, supra. Nor are we confronted with the plight of a parent who has sent a child out to play in a familiar, though potentially dangerous, environment such as exists in a crowded tenement neighborhood. Either of the above examples could easily produce a finding of no parental negligence. See Restatement (Second) of Torts, § 496, Comment a at 558 (1965).

29. The Restatement expresses the standard as follows:
"A parent is barred from recovery for harm to his legally protected interest in the services of his child if
(a) the child is so young as to be incapable of effectively exercising self-protective care, and
(b) the child's incapacity is a contributory factor in bringing about the harm or death, and
(c) the parent has failed to exercise reasonable care to prevent the child from placing itself in a situation in which its lack of self-protective capacity may reasonably be expected to result in harm to it."
Restatement (Second) of Torts, § 496 (1965).