HOUSTON BARGE LINE, INC.,
Plaintiff,

v.

AMERICAN COMMERCIAL LINES,
et al., Defendants.

AMERICAN COMMERCIAL LINES,
INC., et al., Plaintiffs,

v.

HOUSTON BARGE LINE, INC., et
al., Defendants.

Nos. GC 73–99, 74–56–K.

United States District Court,
N. D. Mississippi,
Greenville Division.

June 8, 1976.

Clayton J. Swank, III, and Ernest Lane, Greenville, Miss., for Houston Barge Line.

Douglas C. Wynn, Greenville, Miss., Robert B. Acomb, New Orleans, La., for American Commercial Lines and Inland Tugs Co.

## MEMORANDUM OPINION

KEADY, Chief Judge.

On February 13, 1973, at 2:45 p. m., with a visibility of at least 4 miles in a stretch of navigable water in the lower Mississippi River ¾ths of a mile wide, a near head-on collision occurred between the tows of ascending and descending towing vessels being operated by experienced, veteran Mississippi river pilots. Readily agreeing there was navigational error, each pilot seeks to cast blame upon the other, but we are compelled to hold that neither is free of major contributing fault. Quite incredibly, an unusually wide navigable channel was a special condition for the casualty resulting in property damage to both tows.[1]

1. In actions consolidated for trial, Houston Barge Line, Inc. (successor corporation to

Greenville Towing Company, Inc.), owner and operator of the M/V BEN McCOOL and the

## I. FACTS

The M/V WILBUR MILLS, a vessel with 8400 h. p., towing 31 loaded barges, was proceeding downriver, or southwardly, just above Willow Point Lower Light at Mile 462.7, with Captain Martin "Jake" Hughes at the helm. The overall length of the tow, including the WILBUR MILLS, was 1165 feet; and at its widest point the tow was 245 feet wide. Barges were made up five square, spiked with two starboard strings of four and two barges. The tow moved down stream, with throttle setting full ahead, at a speed of 14 mph; the river current was flowing at approximately 4½ mph. The M/V BEN McCOOL, with 3000 h. p., and Captain Ben Schoolfield at the controls, was pushing upstream a unit tow of four loaded oil barges, in the vicinity of Belle Island Corner Light at Mile 458.6. The tow of the BEN McCOOL, including the vessel, was 1160 feet long and, uniformly, of one-barge width. The first sighting by both pilots occurred when the vessels were in the stated locations; i. e., the WILBUR MILLS was mid-river just above Willow Point Lower Light and the BEN McCOOL was just below Belle Island Corner Light steering close to the Mississippi or right ascending shore. The collision occurred in a bend of the river, at Mile 461 in the vicinity of Terrapin Light, approximately 1200 feet out from the Mississippi shore and almost twice that distance from the Louisiana shore. See Appendix "A", official river map.

In low water, the navigable channel in this area extended no more than 800 feet from the Mississippi shore. A sandbar approximately one mile long formed the western edge of the official channel, and was marked by three black buoys placed by the United States Coast Guard at the eastern edges of the bar. The buoys were positioned almost vertically about one-third of a mile from each other, one buoy being located near the south end of the bar, one in the middle and another at the north end. When the sandbar is exposed, the usual and customary practice is for the pilot of the ascending vessel to hold up at or below Belle Island Corner Light to allow the descending vessel to navigate the bend within the buoyed channel, or near the left descending bank. The sailing line as established by the U. S. Coast Guard, crosses the river from Louisiana to near the left descending (or Mississippi) bank at Willow Point Lower Light (462.7), and runs southerly around the bend on a course near the Mississippi shore until Belle Island Corner Light is passed.

On the day of the collision, however, highwater conditions prevailed with 38 feet on the Vicksburg gauge; this covered the entire sandbar with 26 feet of water, and rendered navigable almost the entire distance between the Mississippi and the Louisiana banks. With these conditions, two tows with the power and dimensions of the WILBUR MILLS and BEN McCOOL, passing in opposite directions, could safely navigate the widened river.

The testimony of the two pilots, each of whom is substantially uncorroborated, is in sharp conflict as to what did occur. Captain Schoolfield testified that upon his sighting the WILBUR MILLS, he intended to ferry out from the Mississippi shore at Belle Island Light, proceed over the slack water of the inundated bar on a course "outside", or westerly, of the buoy line, somewhat favoring the Louisiana shore and make a starboard-to-starboard passing of the WILBUR MILLS, which he assumed would descend "inside" or within the buoyed channel. On the other hand, Cap-

barges in its tow, seeks recovery from the M/V WILBER MILLS, its owner, American Commercial Lines, Inc., and its operator, Inland Tugs Company, for damages of $39,330.75 to the lead barge in the tow of the BEN McCOOL. M/V WILBUR MILLS, American Commercial Lines, owner of the WILBUR MILLS and the five damaged barges in its tow, American Commercial Barge Line Company, the operator and

charterer of the five barges as well as the bailee of their cargo, and Inland Tugs Company, operator of the M/V WILBUR MILLS, claim aggregate damages of $277,342.58 for the loss of one barge and cargo, and physical damage to four other barges, including down time during repairs. On joint motion of the parties, the court reserved all question of damages pending determination of liability.

tain Hughes' intention was quite different, for he testified that upon first observing the BEN McCOOL he perceived it was ascending inside the buoyed channel in such manner that he, Hughes, had ample room for a port-to-port passage by taking his tow over the northern end of the sandbar headed to a point on the Louisiana shore. Since neither pilot intended to remain within the buoyed channel, the tows were set on a course fraught with danger.

Hughes testified that, when first sighted, the BEN McCOOL was driving upstream near the Mississippi shore well past Belle Island Corner Light, on a course clearly inside the buoyed channel (Ex. P-2, Hughes, Point A); that he, Hughes, steered full ahead, with a point fixed on the Louisiana shore; that hearing no signal from BEN McCOOL, and when the heads of the tows were more than one-half mile apart, he gave a one-whistle signal, for a port-to-port passing (Ex. P-2, Hughes, Point B); that he did not hear the BEN McCOOL respond, or see its whistle light; that Hughes did not repeat the one-whistle signal; that neither pilot established radio communication, and hence no passing agreement was reached; that the WILBUR MILLS and its tow remained on a course nearly parallel to and about 300 feet on the outside, or westerly, of the buoy line, the northernmost buoy being passed on the tow's port side; that the WILBUR MILLS held straight rudder, full ahead, until Hughes observed the BEN McCOOL, when the head of its tow passed the middle buoy, suddenly turn to port. Hughes said this occurred when the heads of the two tows were not more than 1200 feet apart, and he then radioed to BEN McCOOL asking if there was mechanical trouble; and upon receiving a negative reply, Hughes requested the BEN McCOOL to go the other way and get out of his way, to which Schoolfield replied that it was too late. It was Hughes' testimony that at this point he sounded the danger signal of four whistles, brought his engines to full stop and began reversing, but to no avail; and, in his view, the collision occurred while the WILBUR MILLS and its tow were on a straight heading,

parallel to the contour of the river and the buoy line, and the BEN McCOOL and its tow were swinging to port; and the two tows came together at a sharp angle, of about 45°, as the lead barge of the BEN McCOOL struck the second barge on the outer, port string of the WILBUR MILLS (Ex. P-1, Hughes, Point C).

In highly divergent testimony, Schoolfield stated that as he passed Belle Island Corner Light, he saw the WILBUR MILLS upriver four miles distant, and in mid-river as if positioned to run inside the official channel (Ex. P-2, Schoolfield, Point A); that he ferried the BEN McCOOL tow out from the Mississippi shore, approached the southernmost buoy, a "diver", but passed it on the inside (or easterly) to avoid any chance of getting it caught "in my wheels"; that upon passing the first buoy he immediately turned to port to navigate slack water covering the sandbar; that he gave a two-whistle signal for a starboard-to-starboard passing when the two tows were about a mile apart (Ex. P-1, Schoolfield, Point B); that he heard no signal in response from the WILBUR MILLS nor did he see a whistle light; that he did not repeat the two-whistle signal, nor did he open radio communication with the WILBUR MILLS, or agree upon a passing. Instead, Schoolfield said that he steered a course somewhat favoring the Louisiana shore, and well outside the two upper buoys, moving ahead at 5½ mph. He stated that he assumed the WILBUR MILLS, though the head of its tow was angling toward the Louisiana shore to counteract the eastward "set" in the bend of the river, would nevertheless "pull down and give port rudder to straighten up down the channel," and navigate east of the buoyed line. This assumption was an utter miscalculation for the WILBUR MILLS was driving forward at full throttle; and when Schoolfield did realize that the WILBUR MILLS and its tow were proceeding mid-river as if in a slide across his bow, he stopped his engines and commenced backing. Schoolfield conceded that he failed to sound a danger signal, and his first and only radio contact with the

WILBUR MILLS was when Hughes called to tell him not to come his way. According to Schoolfield, the forward speed of the BEN McCOOL and its tow had almost halted at the moment of impact; the BEN McCOOL was falling off; that the head of its tow was swinging to starboard, not to port, and the port side of his lead barge struck the port side of the second barge on the outer string of the WILBUR MILLS at approximately a 50° angle (Ex. P–1, Schoolfield, Point C); that the BEN McCOOL lead barge with its high rake climbed over a WILBUR MILLS barge; that five barges in the WILBUR MILLS tow broke loose as the two tows came alongside port-to-port. One of the loosened barges was impaled by, and lay at, the head of the BEN McCOOL tow, three barges drifted port-to-port alongside the BEN McCOOL tow and were secured by deckhands of the BEN McCOOL with grass lines. The remaining loosened barge sank a short distance outside and north of the southernmost buoy.

Hughes and Schoolfield agree that the collision occurred approximately 300 feet west of the buoy line, that they, hearing no signal from the other, gave cross signals, and failed to reach a passing agreement.[2] They also agree that, though each vessel was equipped with modern two-way radio facilities, neither pilot saw fit to radio the other from first sighting until Hughes made the first call when the heads of the tows were not more than 1200 feet apart and a collision appeared imminent. Thus, no less than 13 minutes elapsed from first sighting of the vessels until the collision occurred; during this time interval the two tows were closing at the rate of 1584 feet per minute, based upon 12½ mile minimum speed of the WILBUR MILLS and 5½ mile speed of the BEN McCOOL.

When Captain Hughes sounded the danger signal, several members of his crew, who had not observed the approach since they were inside the vessel, did notice the angle of each tow just before the collision but were unable to fix their headings with respect to either shore. Donald James Crowder, relief captain aboard the WILBUR MILLS, asleep in his room, was awakened by the sound of the danger signal; he rushed to the wheel house, arriving there a minute or so later, but after the collision had occurred. He stated that the WILBUR MILLS and its tow were then parallel with the buoys and the Mississippi shore, straight with the current, and remained on that heading for about two tow lengths, or for several minutes, until the barge sank near the southernmost buoy. Similarly, BEN McCOOL's crew, who heard no signals and were unaware of anything amiss until Schoolfield stopped his engines and began backing, knew little about the maneuvers of either vessel. However, Tommy Bellot, relief mate, and Ronnie Drake, deckhand on the BEN McCOOL, corroborated Schoolfield to the effect that just before and at the moment of impact the BEN McCOOL and its tow were swinging to starboard, with the WILBUR MILLS in a slide across the bow of the BEN McCOOL.

Captain Crowder, himself a veteran river pilot, gave expert testimony for the WILBUR MILLS that with 38 feet of water, on the Vicksburg gauge, the river was safely navigable to within 50 feet of either shore; that under such conditions it was customary for upbound tows to cross from the Mississippi to the Louisiana shore at or above Belle Island Corner Light, favor slack water near the Louisiana shore, and proceed northbound on a two-whistle passing; that downbound vessels, from approximately Mile 464 to Mile 460, customarily navigated the left descending side of the river to make better time in running with the maximum current. Crowder was of the opinion that if an upbound tow adhered to

2. Edward Wayne Wilcox, master of the M/V PORTERFIELD, testified that he was at the helm of his vessel downriver, near Omega Light (Mile 457, when he heard radio conversation which he identified as between Hughes and Schoolfield in which they *agreed* on a one signal, or port-to-port passing. Since this was contradictory to what Hughes as well as Schoolfield testified, we cannot accept Wilcox's testimony as an accurate recollection of the radio message between the WILBUR MILLS and the BEN McCOOL.

the Mississippi shore as far north as Mile 460 when the downbound tow was at Mile 463, "the downbound vessel . . . would wonder why the upbound vessel hadn't went to the Louisiana shore as most vessels do. And it is in high water customary for the northbound vessel to run up one shore or the other to give the main current and room to the downbound vessel." Crowder stated that, nevertheless, if the ascending vessel did adhere to the Mississippi shore, the descending vessel had the option of running over the sandbar, outside the buoys, and on a one-whistle passing.

Captain Leonard Thompson, a highly qualified river pilot, appeared as an expert witness for Houston Barge Line, Inc. He testified that it was customary, if not an unwritten rule, for the downbound vessel to make normal river crossing (above Willow Point Lower Light), and shape the long or concave side of the bend, adhering to the sailing line, not getting in too close to the descending bank but shaping the bend out; and that this navigation would be the accepted practice for a downbound vessel in high as well as low water; that in high water upbound tows usually ferry out over the sandbar, using its depth sounder, favoring the Louisiana shore, but staying out of the "bite of the bend" and allowing the downbound tow to come down shaping the bend side enough that he does not get into trouble"; but that in no event should the vessels meet "in the middle of the bend, where the set is, to where the downbound vessel can slide in on him." Thompson's opinion was that if the WILBUR MILLS and BEN McCOOL were positioned on first sighting as testified to by Captain Hughes, custom called for a two-whistle passing, with the downbound tow taking the long side of the bend and the upbound tow ferrying wide enough to run the short side of the bend. On cross examination, however, Thompson stated that the pilot of the upbound vessel, traveling in the BEN McCOOL direction, should have given the first signal for a two-whistle passing when the head of the tow was at least one mile from the tow of WILBUR MILLS, and that he should not have waited until the BEN McCOOL reached a position fixed by Schoolfield for the first signal; with the tows thus positioned by Schoolfield, a danger signal of four shorts should have been blown to alert the WILBUR MILLS, followed by two whistles for starboard passing. Thompson considered it hazardous for the WILBUR MILLS to be pointing across the bow of the BEN McCOOL less than ¾th of a mile away. Moreover, Thompson was of the firm opinion that both pilots should have had radio communication upon first sighting and agreed upon passage. Radio communication was particularly important, Thompson believed, since the downbound vessel would have to be somewhat below Willow Point Lower Light before its pilot could visually perceive the correct location of an upbound vessel at the foot of the bend and judge how wide the upbound vessel was off the Mississippi shore, against the bank in the background. Thompson also stated that the upbound tow should steer well to the outside, or 200 feet westerly, of the black buoy line to afford the downbound vessel a clear view of the buoyed channel. In Thompson's opinion, the two vessels, considering their speed and the river current, were on a collision course as the heads of their tows closed to within 1000 feet, and both pilots should have blown distress signals and taken evasive action. Thompson stated that if the vessels were positioned at Point B as designated by Hughes when he gave a one-whistle signal, though danger did not appear imminent, "I would most certainly have been on the radio to have determined that the passing was going to be agreeable or I would have blown the distress signal. And that goes for both pilots . . . because that was passing too close for the width of the river."

The court finds from practically undisputed evidence that at the approximate position of the vessels upon their sighting each other, prudent and safe navigation would have been for the WILBUR MILLS to have descended within the buoyed channel along the sailing line near the Mississippi shore and for the upbound BEN McCOOL to cross the river at or near Belle

Island Corner Light, proceed over the sand-bar in the proximity of the Louisiana shore and well outside the buoys. This navigation would have called for a starboard passing on two whistles. Though the descending vessel had the privilege or option of leaving the buoyed channel and itself proceeding in slack water near the Louisiana shore, that maneuver would have been unusual and not undertaken by a reasonable navigator without first having a clear understanding for port-to-port passage with any upbound river traffic, particularly since the pilot's visual perception as to an accurate location of the upbound vessel was somewhat hampered by the bend in the river. The court also finds that the pilot of an ascending vessel steering no more than 50 feet from the Mississippi shore until well above Belle Island Corner Light and about 200 feet below Mile 460, and then ferrying out no more than 60 feet easterly of the southernmost buoy before turning to port—as Captain Schoolfield admitted on cross examination—should reasonably know that his heading might likely be misleading to a nearby descending vessel and require both early signals and prompt radio communication to clarify that a starboard passage was intended. Though Schoolfield signalled first, and for a two-whistle passing, his signal was initiated when the heads of the two tows were considerably less than a mile apart, and hearing no response, Schoolfield did not repeat his signal, or attempt to communicate by radio with the WILBUR MILLS. He never gave a danger signal, but he did stop his engines and began backing. Captain Hughes, though signalling for a one-whistle passing at less than one mile distant, saw the BEN McCOOL coming upriver on a close alignment; yet, without any passing understanding, he proceeded full ahead with no change in throttle setting until the heads of the two tows came within 600 feet of each other; and not until then did Hughes sound the danger signal, begin to reduce speed and attempt to reverse his engines. The forward speed of

the WILBUR MILLS at moment of impact was at least 12½ mph.

The only explanation that Hughes gave for this belated action was that everything appeared safe until the BEN McCOOL tow suddenly turned to port when the heads of the two tows were no more than 1200 feet apart. This explanation is incredible, for, in the court's opinion, the BEN McCOOL and its tow were swinging to starboard at the same time that the WILBUR MILLS and its tow were pointed toward the Louisiana shore. First, the physical evidence supports Schoolfield's version as to the correct headings of the tows upon collision. It is of significance that, apart from the one barge impaled at the head of the BEN McCOOL tow, three other barges loosened from the WILBUR MILLS did not move away but drifted port-to-port alongside the BEN McCOOL tow. This fact strongly indicates a starboard heading of the BEN McCOOL for if its lead barge had struck the WILBUR MILLS tow at a 45° angle at a port heading, as Hughes maintained, the loosened barges necessarily would have moved downstream with the flow of the current and away from the BEN McCOOL. Second, the court agrees with the expert opinion of Captain Thompson that it would have been a physical impossibility for the tow of the BEN McCOOL, aligned close to the port side of the buoys, to suddenly alter its course when the lead barge of the WILBUR MILLS was only 1200 feet distant, and move to port at least 350 feet to strike the second barge in the WILBUR MILLS port string; that such a maneuver, in the expert's opinion, would have required minimum time of 1½ minutes to accomplish whereas the established closing speed of the two tows exceeded 1500 feet per minute. Hughes' version of a "sudden emergency" [3] must be rejected because it is contrary to the weight of the credible evidence.

In concluding that the captains of both vessels were guilty of major contributing fault, the court has considered the demean-

---

**3.** In justification of his navigation, Captain Hughes said "I didn't feel there was any need for any whistles or anything else, the course he [BEN McCOOL] was on, the course I had, there was no need to worry about nothing until this sudden change come up." (T. 419).

or, character and overall impressions of the two captains and has endeavored to determine the truth from irreconcilable testimony in the light of the admissions of both captains, the physical facts and the more substantial expert testimony. We find it impossible to exonerate either of the vessels of serious pilot error.

## II. LAW

We have undoubted subject matter jurisdiction in admiralty, 28 U.S.C. § 1333; and our decision on the merits is controlled by a familiar matrix of applicable statutes, regulations and established principles of the general maritime law.

The first statutory elements relevant to a determination of liability are to be found in the Navigation Rules for Western Rivers, 33 U.S.C. § 301 et seq., applicable to all vessels plying the Mississippi River. Several Rules deal directly with avoidance of collision between steam vessels (which by definition include the M/V WILBUR MILLS and the M/V BEN McCOOL, 33 U.S.C. § 302).

Rule 18, 33 U.S.C. § 343 sets forth the normal procedure to be followed when ascending and descending vessels pass on the Mississippi River:

"The pilot of the ascending steam vessel shall give the first signal for passing, which shall promptly be answered by the same signal by the pilot of the descending steam vessel, if safe to do so, and both shall be governed accordingly; but if the pilot of the descending vessel deems it dangerous to take the side indicated by the ascending steam vessel, he shall immediately signify that fact by sounding four or more short and rapid blasts, the danger signal, and it shall be the duty of the pilot of the ascending steam vessel to answer by a similar signal and the engines of both shall immediately be stopped and backed, if necessary, until signals for passing are given, answered, and understood. After sounding the danger signal by both vessels, the pilot of the descending steam vessel shall indicate by

his whistle the side on which he desires to pass, and the pilot of the ascending steam vessel shall govern himself accordingly, the descending steam vessel being entitled to the right-of-way.

"The pilot of the descending steam vessel shall not blow the first signal, except that if the other vessel has not whistled when the steam vessels, or the forwård end of their tows, if being pushed ahead, are within one-half mile of each other, he shall blow the first danger signal, which shall be promptly answered by a danger signal by the ascending vessel; but whether answered or not, the pilot of the descending vessel shall indicate the side on which he desires to pass, and both vessels shall be governed accordingly."

Rule 21, 33 U.S.C. § 346, provides:

"Every steam vessel, when approaching another vessel so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse."

Finally, Rule 25, 33 U.S.C. § 350, instructs:

"In obeying and construing these rules due regard shall be had to all dangers of navigation and collision and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger. When such departure becomes necessary neither vessel shall have the right-of-way and both shall navigate with caution until danger of collision is over."

Supplementary to these statutory requirements, and also of controlling effect, are the Pilot Rules for Western Rivers, 33 C.F.R. § 95.01 et seq., of which § 95.19 is here pertinent:

"The passing signals, by the blowing of the whistle, shall be given and answered by pilots, in all weathers, when approaching each other; and, wherever possible, the signals shall be given and answered before the steam vessels, or if towboats pushing tows, the head of such tows, have arrived at a distance of half mile of each other."

Also of significance is the accepted custom practiced by river pilots in navigating this section of the River under conditions similar to those which obtained on February 13, 1973. For this we credit the expert testimony of Captain Thompson as establishing the accepted method of navigating this bend of the River. According to Thompson, with a reading of 38 feet on the Vicksburg gauge, safe passage of two tows, meeting at this point on the River (about Mile 461, in the vicinity of Terrapin Light), is customarily accomplished by having the ascending vessel steer over the submerged sand bar to the west of the buoy line, while the descending vessel follows the sailing line in the official channel east of the buoys, thus making for a starboard-to-starboard passage.

Finally, we must take cognizance of the traditional standards of good seamanship and due care in the operation of towing vessels to which the admiralty binds all maritime pilots.

As the actions of Hughes and Schoolfield prior to the collision are compared with the legal duty of care imposed upon them as river pilots, both men, it is plain, fell short of the mark. Each pilot is chargeable with unmistakeable failures of duty which contributed substantially to the collision; it is equally clear that had either acted with the caution of good seamanship which the situation plainly required, the accident would not have occurred.

We therefore conclude, as we must, that both Houston Barge Line and American Commercial Barge Lines, as principals responsible for the acts of their agents committed in the course of employment, are guilty of major contributing fault and must share responsibility for the ensuing damage.[4] We now turn to consideration of the proper allocation of damages between the parties.

Until recently, the maritime law was well settled, albeit unsatisfactorily, that in a maritime collision between two vessels in which both parties are guilty of contributing fault, the total property damages resulting from the collision are to be divided equally between the parties, irrespective of their relative degree of fault. *The Schooner Catharine v. Dickinson,* 58 U.S. (17 How.) 170, 15 L.Ed. 233 (1854). Now, after 120 years, this archaic and long criticized rule has been swept from the admiralty by *U. S. v. Reliable Transfer Co.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), which unanimously overruled the divided-damages rule of *The Schooner Catharine.*

Current law permits an enlightened comparative negligence determination[5] by the trier of fact, with commensurate apportionment of damages:

"We hold that when two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damage is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault." 421 U.S. at 411, 95 S.Ct. at 1715, 44 L.Ed.2d at 262.

Though the collision at issue occurred almost two years before *Reliable Transfer,* we are not unwilling to enforce the compar-

---

4. There is therefore no occasion to invoke in this case either the rule of *The Pennsylvania,* 86 U.S. (19 Wall) 125, 22 L.Ed. 148 (1874), or the doctrine of "major-minor" fault. See *The City of New York,* 147 U.S. 72, 13 S.Ct. 211, 37 L.Ed. 84 (1893). Neither is this a case where either vessel was placed in the perilous position through no fault of its own and then committed errors of judgment in attempting to extricate itself. See *Union Oil Co. of Calif. v. Tug Mary Malloy,* 414 F.2d 669 (5 Cir. 1969).

5. This standard derives, of course, from the seminal comparative negligence statute enacted by the Mississippi Legislature more than 65 years ago. Laws of 1910, ch. 135, currently Miss.Code Ann. § 11–7–15 (1972). See W. Prosser, Law of Torts § 67 at 436 (4th ed. 1971).

ative negligence rule in this case, since this "court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *Bradley v. Richmond School Board,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). Accord, *Thorpe v. Housing Authority of the City of Durham,* 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969); *U. S. v. Schooner Peggy,* 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801); *Thompson v. Madison County Board of Education,* 496 F.2d 682 (5 Cir. 1974); *Armstead v. Starkville Municipal Separate School District,* 395 F.Supp. 304 (N.D.Miss.1975); *Latham v. Chandler,* 406 F.Supp. 754 (N.D.Miss.1976). No serious contention can be made that to deny the parties the benefit of the divided damages rule would work a manifest injustice. Indeed, though each party denies it was guilty of significant fault which contributed substantially to the collision, each assumes the applicability of *Reliable Transfer.*

◾ Under *Reliable Transfer* we are to allocate liability between the parties proportionately to the comparative degree of fault "whenever it is possible to fairly measure the comparative degree of their fault." It would be simplistic to conclude that since both pilots were guilty of serious derelictions of duty, their employers must be held equally liable but that resolution would hardly be consistent with what we believe to be the weight of the credible evidence. In weighing the degree of negligence attributable to each vessel, we, as the fact finder, must proceed upon practical judgment supported by the evidence; our duty is "to consider all the facts and circumstances in evidence, meanwhile weighing preponderances, drawing inferences, balancing hypotheses, and comparing delinquencies in the light of * * * experiences as reasonable and honorable men." *Tombigbee Mill and Lumber Co. v. Hollingsworth,* 162 F.2d 763, 766 (5 Cir. 1947); *Wright v. Standard Oil Co.,* 319 F.Supp. 1364, 1373 (N.D.Miss.1970), modified 470

F.2d 1280, cert. denied 412 U.S. 938, 93 S.Ct. 2772, 37 L.Ed.2d 398.

◾ In accordance with the foregoing standard, we hold that the fault of the WILBUR MILLS and its pilot, in quantity as well as in quality, is substantially greater than that of the BEN McCOOL and its captain. Contrary to Rule 18, Hughes, as the pilot of the descending vessel, failed to respond to the first signal which was given by the ascending vessel, calling for a starboard passing. It was Hughes' statutory duty either to promptly answer the BEN McCOOL by the same signal or, if Hughes thought it was dangerous to take the side indicated by the BEN McCOOL, sound the danger signal. Hughes did neither. Instead, he proceeded forward at full throttle, returning a cross signal for passing on one whistle, and belatedly sounded the danger signal only when collision was imminent. While Hughes testified, no doubt as an exaggerated expression, that "whistles went out with the horse and buggy," his preference for visual perception rather than resorting to the radio to agree upon a passage with the BEN McCOOL, considering the speed and size of his tow, was quite indefensible. Moreover, Hughes' failure to timely reduce speed and bring his tow under control commensurate with the likelihood of danger contributed materially to the extent of the loss that resulted from the collision. We hold that Hughes' negligence was twice as great as that of Schoolfield. Schoolfield's most serious omissions were to fail to repeat his two-whistle signal when it went unanswered or to use radio communication to agree upon safe passage instead of relying upon assumptions. He also failed to sound a danger signal timely to the WILBUR MILLS, an act which would have been required of a reasonably prudent mariner under the circumstances. Although it might be regarded as a matter of secondary importance, Schoolfield's navigation easterly rather than westerly of the southernmost buoy was not good seamanship with a descending vessel in sight. There was no justification for the BEN McCOOL not to

go outside the southernmost buoy and make its physical position in the river consistent with the signal of two whistles for starboard passing. We therefore assess liability for the casualty as follows: two-thirds to the WILBUR MILLS, American Commercial Lines and its allied interests, and one-third to the BEN McCOOL and its owner and operator, Houston Barge Line, Inc.

Let an order be issued accordingly, with the question of damages reserved for future determination.

APPENDIX A to follow

APPENDIX "A"

OFFICIAL RIVER MAP OF UNITED STATES CORPS OF ENGINEERS

